UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

BERNICE FORRESTER,

                   Plaintiff,                 **MEMORANDUM & ORDER**

      -against-                         **12-CV-363 (NGG) (LB)**

PRISON HEALTH SERVICES and CORIZON
HEALTH, INC.,

                   Defendants.
-------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

      Plaintiff Bernice Forrester brings this employment discrimination action against

Defendants Prison Health Services, Inc. ("PHS") (s/h/a Prison Health Services) and its successor,

Corizon Health, Inc. ("Corizon"), for violations of the Americans with Disabilities Act

("ADA"), 42 U.S.C. §§ 12101-213, the Age Discrimination in Employment Act ("ADEA"), 29

U.S.C. §§ 621-34, the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-54, and the

New York City Human Rights Law ("NYCHRL"), N.Y. Comp. Codes R. & Regs. tit. 8, §§ 8-

107, 8-602 to -604. (Am. Compl. (Dkt. 16).) Plaintiff alleges that Defendants discriminated

against her on the basis of disability and age, subjected her to a hostile work environment,

interfered with her FMLA rights, and retaliated against her for exercising her rights under the

ADA and FMLA. (Id.)

      Defendants move for summary judgment. (Mot. for Summ. J. (Dkts. 65-66).) By Order

dated September 19, 2014, the court referred Defendants' motion for summary judgment to

Magistrate Judge Lois Bloom for a Report and Recommendation ("R&R") pursuant to 28 U.S.C.

§ 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b)(1). (Sept. 19, 2014, Order (Dkt. 74).)

The R&R recommended that the court grant summary judgment to Defendants on all of

Plaintiff's federal claims, and that it decline to exercise supplemental jurisdiction over her NYCHRL claims. (R&R (Dkt. 76).) For the reasons discussed below, the court ADOPTS IN PART and MODIFIES IN PART the R&R, and ultimately GRANTS Defendants' motion for summary judgment.

## I.    BACKGROUND

The court adopts the summary of the relevant factual record outlined in the R&R. (See R&R at 2-18.) However, in order to facilitate the court's discussion of the relevant legal standard, and its analysis of Plaintiff's fact-based objections to the R&R, the court provides the following summary.[1]

Plaintiff began working at the medical facilities at the New York City correctional facility on Rikers Island as a medical staff coordinator in 1988. (Id. at 2.) Over the years, she performed well and was promoted several times. (Id.) In 2001, PHS, a private company,[2] became the healthcare provider at Rikers Island pursuant to a contract with the New York City Department of Health and Mental Hygiene ("DOH"). (Id.) PHS hired Plaintiff, and promoted her in 2004 to the position of Health Service Administrator ("HSA"). (Id.) In 2009, Plaintiff was transferred to Rikers Island's North Infirmary Command ("NIC"), where Plaintiff, as HSA, was the NIC's operational manager, responsible for supervising administrative personnel, acting as a liaison with the City of New York Department of Correction ("DOC") and the DOH, and overseeing administrative matters, such as ordering supplies, scheduling patient visits, and ensuring sufficient staffing. (Id. at 2-3.) The NIC's clinical operations were supervised by other staff—namely, a Site Medical Director, a Director of Nursing, a Mental Health Unit Chief, and a

---

[1] Additional facts emphasized by Plaintiff in her objections are included in the court's substantive analysis infra.

[2] In 2011, PHS's parent company merged with another company to create successor Corizon. (R&R at 17 n.10.) In this Memorandum and Order, the court refers to PHS and Corizon together as "PHS" or "Defendants."

Pharmacy Supervisor. (Id. at 3.) Along with Plaintiff, this team shared responsibility for requesting additional staff and supplies for the NIC, and was, in turn, supervised by Fazal Yussuff, who beginning in 2005 was the Director of Operations. (Id.) As HSA of the NIC, Plaintiff believed her hours to be from 9:00 a.m. to 5:00 p.m., subject to change in accordance with staffing needs, although at times Yussuff required the NIC leaders to rotate responsibility for arriving at 8:00 a.m. (Id. at 4.)

Plaintiff was diagnosed with diabetes in 2001. (Id. at 3.) At times, this condition causes imbalances in Plaintiff's blood sugar levels upon waking, which required her to report late to work on certain mornings. (Id. at 3-4.) In August 2008, Plaintiff began to experience more frequent imbalances, and therefore requested intermittent leave under the FMLA, which Defendants granted. (Id. at 4-5.) In February 2010, Plaintiff applied to renew her leave, which Defendants also granted. (Id. at 5.)

Soon after Plaintiff's 2010 leave application, however, Yussuff challenged her eligibility for FMLA leave (along with another employee's eligibility) before Director of Human Resources Jerome Donahue. (Id.) Yussuff questioned whether an employee could take intermittent leave for two consecutive terms for the same health condition. (Id.) Donahue thereafter informed Plaintiff that "her eligibility was in question and [that he] was going to look into it." (Id. (quoting Jerome Donahue Dep. Tr. ("Donahue Dep.") (Decl. of Jakob B. Halpern ("Halpern Decl." (Dkt. 66-1)), Ex. G (Dkt. 66-2)) at 28:4-14.) Plaintiff stated during a deposition that she interpreted this information from Donahue as a revocation of her FMLA leave, but also acknowledged that Donahue never used the word "revoke," and that she was never actually denied the right to assert her FMLA when arriving late to work. (Id. (quoting Bernice Forrester Dep. Tr. ("Pl. Dep.") (Aff. of Joshua Bernstein ("Bernstein Aff." (Dkt. 67-3)), Ex. 6) at 134:2-

136:10).) After completing his investigation, Donahue confirmed that Plaintiff was in fact still eligible for FMLA leave, and so informed Yussuff and Plaintiff. (Id.) In 2011, Defendants again approved Plaintiff's renewed application for FMLA intermittent leave. (Id. at 6.)

During her period of employment, Plaintiff made several requests for reasonable accommodation regarding her time of arrival. (Id. at 12-14.) These requests generally related to the ability to call in and arrive late when Plaintiff's blood sugar was too high or too low upon waking in the morning. (Id.) Defendants never denied Plaintiff's requests for accommodation, but did question whether she misused leave on a particular occasion, and also noted, in connection with arriving at a reasonable accommodation, that "[i]t would constitute a severe hardship on operations if we could not predict your arrival times within a reasonable degree of certainty." (Id. at 14 (quoting Sept. 12, 2011, Email Correspondence (Halpern Decl., Ex. CC (Dkt. 66-3))).)

Plaintiff received FMLA leave from August 6, 2008, until the termination of her employment in October 2011; during this period, according to Sick Call logs, she reported late to work 232 times.[3] (Id. at 6.) Of the 232 instances of lateness recorded on the Sick Call logs, 40 were recorded as "FMLA leave," 49 were marked as due to sickness, and 121 were marked "late." (Id.) During approximately this same period, Yussuff sent five emails directly to Plaintiff concerning her lateness (at times copying other supervisory employees), although certain of Yussuff's emails pre-date Plaintiff's initial application for FMLA leave. (Id. at 6-7 (citing Halpern Decl., Exs. P-R (Dkt. 67-3) (reflecting emails sent by Yussuff in September 2006, December 2006, October 2008, November 2009, and May 2010)).) Certain of

---

[3] Defendants also point to Plaintiff's "KRONOS" time logs—corresponding to the time she clocked in for work—which show 466 late arrivals during the same time period. (R&R at 6.) For purposes of this Memorandum and Order, the court focuses its analysis on the Sick Call logs, which are Defendants' centralized record-keeping system to track late arrivals and unexpected absences across all clinics on Rikers Island. (See generally Decl. of Donald Doherty (Dkt. 65-3) ¶¶ 52-60.)

the emails sent directly to Plaintiff referenced her medical condition; others did not. (See, e.g., id. at 6 (Nov. 18, 2009 email) ("I am concerned about your time and attendance. I am fully aware that you have medical problems that might justify some of this but with the microscope being on NIC and with you being out so frequent[ly] makes me very uncomfortable. I would like for you to start getting to work on time and to improve your time and attendance." (alteration in R&R)).) Yussuff also sent emails to groups of employees that included Plaintiff and non-FMLA employees (for example, all HSAs across Rikers Island), urging employees to arrive on time. (See id. at 7.)

In August 2010, DOH employees complained to Defendants about the failure of NIC staff to comply with procedures governing the provision of supplies, hand washing, and responding to patient complaints. (Id.) In connection with these complaints, Homer Venters, the DOH liaison who monitored Defendants' operations, determined that new leadership was needed for the NIC, including in the HSA position. (Id. at 8.) DOH even threatened to take over the operation of the NIC from PHS. (Id.) In response to DOH's complaints, Defendants decided to convert the HSA position in the NIC into a clinical position, and terminated Plaintiff's employment due to her lack of a clinical degree and experience. (Id.) Venters, however, expressed doubt that removing Plaintiff as HSA was sufficient to remedy the NIC's problems, and stated that he was "displeased" with Plaintiff's termination. (Id. (quoting Homer Venters Dep. Tr. ("Venters Dep.") (Halpern Decl., Ex. B (Dkt. 66-2)) at 38:7-9, 38:14-17, 40:7-21).) Around the same time, Plaintiff met with PHS Senior Vice President Donald Doherty, asserting that Yussuff had harassed her for taking FMLA leave, and requested a position in another prison. (Id.) Ultimately, Doherty delayed the planned reorganization of the NIC, and reinstated Plaintiff

on a temporary basis to her position as HSA of the NIC; Defendants paid Plaintiff for the three business days she did not work prior to her reinstatement. (Id. at 8-9 & n.5.)

In March 2011, while still HSA of the NIC, Plaintiff received a performance review for the year 2010. (Id. at 9-10; see also March 2011 performance review (Halpern Decl., Ex. V (Dkt. 67-3)).) For this review, Defendants utilized a new review structure, called the "360 degree" group review, and all HSAs were reviewed under this new structure. (R&R at 9-10.) A panel of the executive staff, including Yussuff and five others, reviewed Plaintiff's performance. (Id. at 9.) Plaintiff received a composite score of 1.12, which fell between the categories of "Needs Improvement" and "Meets Expectations." (Id. at 10.)

In April 2011, a team of executives from PHS—including certain executives involved in Plaintiff's then-recent performance review—discovered "horrific conditions" in the NIC. (Id. at 11 (quoting May 10, 2011, Mem. from Dr. Jay Cowan (Decl. of Donald Doherty ("Doherty Decl.") (Dkt. 65-3)) ¶ 108, Ex. H (Dkt. 65-8)).) That same month, DOH discovered additional issues in the NIC, and alerted Defendants. (Id.) Ultimately, Venters recommended a change in leadership at the NIC, including the HSA position. (Id.) Doherty, in turn, determined that Plaintiff's performance had failed to improve, and instead of offering her a transfer to another HSA position outside of the NIC, offered Plaintiff either termination (with a severance) or a demotion to the position of Administrative Assistant to an HSA. (Id.) Plaintiff reluctantly accepted the offer to become an Administrative Assistant to an HSA, but stated that she viewed the demotion to be the result of discrimination. (Id.) The other leaders of the NIC were transferred to positions elsewhere in the prison that were similar to their respective positions in the NIC; none were demoted. (Id. at 12.) Following the changes in leadership, Doherty stopped receiving complaints from DOH concerning Defendants' operation of the NIC. (Id.)

In order to work at Rikers Island, Plaintiff maintained a security clearance with DOC. (Id. at 15.) PHS policy also required employees to comply with the Health Insurance Portability and Accountability Act ("HIPAA") and the company's information security policies. (Id.) These prohibited employees from "sending confidential information via the Internet," advised employees that the company monitored their Internet activity, and warned that a breach of the policies could lead to suspension or termination. (Id.) An employee could breach the policies by, inter alia, failing to encrypt emails containing protected health information. (Id.) In April and September 2011, PHS emailed all employees, including Plaintiff, reminding them of a "zero tolerance policy" for HIPAA violations. (Id. (quoting Sept. 6, 2011, Email from Eileen McNerney (Doherty Decl. ¶¶ 134, 135, Ex. P (Dkt. 65-9))).)

As part of a compliance program, Doherty authorized Employee Relations Manager Eileen McNerney to review all employee email accounts. (Id. at 16.) McNerney reviewed email accounts three to four at a time, by employee position and in alphabetical order. (Id.) On September 20, 2011, approximately five months after Plaintiff commenced her role as Administrative Assistant to an HSA outside of the NIC, McNerney reviewed Plaintiff's email account. (Id.) McNerney discovered ten emails forwarded from Plaintiff's work email address to Plaintiff's home email address; the emails each attached at least one daily "BING report." (Id.) A daily BING report is generated by DOC, and identifies by name, book identification number, gang association status, housing location, and release date the inmates segregated for committing infractions. (Id.) The BING reports attached to the emails were unencrypted, and contained hand-written notes regarding inmate health, including status, referrals, and "HIV." (Id.) McNerney immediately alerted Doherty, and on Doherty's order, McNerney informed

Plaintiff she was suspended pending an investigation. (Id. at 17.) Doherty also informed Venters of the breach, and later reported the incident to DOC. (Id.)

Ten days later, during a meeting with Doherty and McNerney, Plaintiff denied sending the emails, but acknowledged that at times she did forward other work emails to her home email account, because she felt that she was being targeted by Defendants and wanted to retain evidence. (Id.)

Ultimately, on October 21, 2011, DOC informed Doherty that it deemed the BING emails to be a security breach, and that Plaintiff's security clearance was indefinitely suspended. (Id. at 18.) On October 27, 2011, Defendants terminated Plaintiff's employment as an Administrative Assistant to an HSA, stating that she had "'jeopardized patient safety and security,' 'violated [] federal HIPPA laws,' by sending [Protected Health Information] over an unsecure server, and indefinitely lost her clearance to access Rikers Island." (Id. (quoting Oct. 27, 2011, Ltr. to Pl. (Halpern Decl., Ex. VV (Dkt. 66-3))) (first alteration in R&R).)

## II.    THE REPORT AND RECOMMENDATION

On January 5, 2015, Judge Bloom issued an R&R recommending that the court grant Defendants' motion for summary judgment on Plaintiff's federal claims, and that the court decline to exercise supplemental jurisdiction over her NYCHRL claims. (Id. at 1-2.)

Judge Bloom first addressed Plaintiff's ADA claims that Defendants: (1) created a hostile work environment; (2) unlawfully discriminated against her; and (3) unlawfully retaliated against her. (See id. at 21-40.) With respect to the hostile work environment claim, Judge Bloom acknowledged that the Second Circuit has to yet to determine whether a hostile work environment claim is cognizable under the ADA; assuming that such a claim is cognizable, Judge Bloom concluded that Plaintiff failed to establish that the conditions of her employment

were sufficiently severe or pervasive to create a hostile work environment. (Id. at 22-24.) Regarding the claim of discrimination based on disability, Judge Bloom concluded that (a) Plaintiff raised a prima facie case; (b) Defendants identified several legitimate, non-discriminatory reasons for the adverse employment actions (namely, Plaintiff's numerous unexcused absences, complaints about her job performance, and Plaintiff's significant breach of HIPAA and company security policies); and (c) Plaintiff failed to offer sufficient evidence to support the inference that Defendants' proffered reasons were mere pretext. (Id. at 24-38.) Finally, with respect to the ADA retaliation claim, Judge Bloom concluded that Plaintiff again failed to offer sufficient evidence to support the inference that Defendants' legitimate, non-discriminatory reasons for the actions they took against Plaintiff were pretext for retaliation. (Id. at 38-40.)

Next, Judge Bloom addressed Plaintiff's FMLA claims that Defendants: (1) interfered with her FMLA rights; and (2) retaliated against her for exercising those rights. (See id. at 40-43). As with the hostile work environment claim under the ADA, Judge Bloom acknowledged that the Second Circuit has yet to delineate the elements of a prima facie case of FMLA interference; applying a framework used in Higgins v. NYP Holdings, Inc., 836 F. Supp. 2d 182, 183 (S.D.N.Y. 2011), and other district court cases, Judge Bloom concluded that Plaintiff failed to establish that she was in fact ever denied benefits to which she was entitled under the FMLA, a necessary element of the claim. (R&R at 40-41.) With respect to the FMLA retaliation claim, Judge Bloom concluded that the claim failed for the same reason the ADA retaliation claim failed—namely, that Plaintiff did not offer sufficient evidence to support the assertion that Defendants' actions were pretext for retaliation. (Id. at 41.)

Finally, in light of her recommendation that the court grant summary judgment to

Defendants on all federal claims, Judge Bloom further recommended that the court decline to exercise supplemental jurisdiction over the NYCHRL claims.[4]  (Id. at 42-43.)

## III.  PLAINTIFF'S OBJECTIONS TO THE REPORT AND RECOMMENDATION

On January 20, 2015, Plaintiff filed lengthy objections to the R&R.  (Pl. Obj. to R&R ("Pl. Obj.") (Dkt. 77).)  Defendants filed a lengthy response supporting the R&R.  (Defs. Resp. to Pl. Obj. ("Defs. Resp.") (Dkt. 80).)

As an initial matter, the court notes that Plaintiff's objections span 40 pages, well over the 25-page limit imposed by the court's Individual Rules.[5]  See Individual Rules of Judge Nicholas G. Garaufis Rule III.C.[6]  In light of Plaintiff's lengthy objections, and in light of Defendants' prior consent to extensions of time for Plaintiff to file her own briefs on other motions, it is surprising that Plaintiff's counsel refused to consent to a two-week extension of Defendants' time to respond to the voluminous objections.  (See Jan. 29, 2015, Ltr. Mot. for Ext'n of Time to File Resp. (Dkt. 78) at 1 & Ex. A ("Defendants contacted Plaintiff's counsel to request consent to this brief adjournment but Plaintiff—without explanation—refused to provide consent."); Jan. 29, 2015, Order (Dkt. 79) (granting Defendants' request for two-week extension to respond).)  This court has previously warned Plaintiff's counsel about his conduct in this case. (See May 9, 2014, Order (Dkt. 64) ("The court cautions Plaintiff's counsel that it will not

---

[4]  Although Plaintiff also alleges an age discrimination claim under the ADEA, Plaintiff failed to offer any evidence in support, and in fact, "withdrew" her age-related claim in response to Defendants' motion for summary judgment. (See Pl. Mem. of Law in Opp'n to Defs. Mot. for Summ. J. (Dkt. 67) at 2; R&R at 1 n.1.)  Thus, summary judgment is GRANTED for Defendants with respect to Plaintiff's federal, age-related claims under the ADEA.

[5]  Defendants, too, exceeded the court's 25-page limit, requesting that if the court considers Plaintiff's entire submission, it also consider Defendants' entire 42-page brief.  (See Defs. Resp. at 5 n.3.)  In reaching its decision, the court has considered the entirety of both parties' filings, as well as the entirety of the underlying briefing and factual record before Judge Bloom.

[6]  Plaintiff's objections also lack a table of contents and table of authorities, required by the court's Individual Rules. See id.

tolerate similar misrepresentations in the future.").) Counsel is again reminded that he can act in a professional and courteous manner while also zealously representing his client.

Plaintiff raises numerous objections to the R&R, which are discussed in turn below. In brief, Plaintiff argues that Judge Bloom "omit[ted] entirely much of the evidence Plaintiff has submitted" in opposition to the motion for summary judgment (Pl. Obj. at 1), and that Judge Bloom made several errors of law in considering Plaintiff's various claims (see, e.g., id. at 5 (arguing that Judge Bloom applied the incorrect legal standard to Plaintiff's ADA claims)). Defendants respond that Judge Bloom properly considered the factual record, focusing on admissible, material evidence (see, e.g., Defs. Resp. at 4-5), and that Judge Bloom properly applied the correct legal standard to each of Plaintiff's federal claims (see id. at 7).

## IV. STANDARD OF REVIEW

In reviewing a magistrate judge's R&R, the district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). The court must make "a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." Id. To obtain de novo review, an objecting party "must point out the specific portions of the report and recommendation to which [that party] object[s]." U.S. Flour Corp. v. Certified Bakery, Inc., No. 10-CV-2522 (JS), 2012 WL 728227, at *2 (E.D.N.Y. Mar. 6, 2012); see also Fed. R. Civ. P. 72(b)(2) ("[A] party may serve and file specific written objections to the [R&R]."). If a party "makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error." Pall Corp. v. Entegris, Inc., 249 F.R.D. 48, 51 (E.D.N.Y. 2008); see also Mario v. P&C Food Mkts., Inc., 313 F.3d 758,

11

766 (2d Cir. 2002). Portions of an R&R to which a party makes no objection are also reviewed for clear error. U.S. Flour, 2012 WL 728227, at *2.

Plaintiff opens by stating that she "objects to the entirety of the R&R." (Pl. Obj. at 4.) Such an objection is too general to render the entire, 43-page R&R subject to de novo review. See, e.g., Gutman v. Klein, No. 03-CV-1570 (BMC), 2008 WL 5084182, at *1 (E.D.N.Y. Dec. 2, 2008) (rejecting party's objection to the "entirety" of an R&R and holding that "[a] proper objection requires reference to a specific portion of the magistrate judge's recommendation"). The majority of Plaintiff's objections, however, do address specific legal and factual analyses and conclusions contained in the R&R. Thus, the court conducts a de novo review of those portions of the R&R discussed below. With respect to any portion of the R&R that is not objected to, or to which Plaintiff's objection is only general or conclusory, the court has reviewed for clear error, finding none.[7]

## V.    DISCUSSION

The court now addresses Plaintiff's specific objections. Applying de novo review, the court ADOPTS or MODIFIES the portions of the R&R specifically objected to, and GRANTS summary judgment on all federal claims.

### A.    Judge Bloom's Reliance on Defendants' Version of the Factual Record

Plaintiff's most vehement objection to the R&R addresses Judge Bloom's review and summary of the factual record. (See, e.g., Pl. Obj. at 3 ("The R&R also does not mention Plaintiff's 80-page Response to Defendants' Statement of Undisputed Material Facts [] save for a

---

[7] By way of example, Plaintiff does not object to Judge Bloom's recommendation that the court decline to exercise supplemental jurisdiction over the NYCHRL claims should it dismiss the federal claims. Finding no clear error, the court agrees with Judge Bloom and, in light of the court's dismissal of all federal claims, declines to exercise supplemental jurisdiction over the NYCHRL claims. (See R&R at 42-43.) See also Velazco v. Columbus Citizens Found., 778 F.3d 409, 411 (2d Cir. 2015) (per curiam) (requiring a separate and independent analysis of parallel state and city law claims, but noting that "a federal court need not undertake such a review of a NYCHRL claim if, after disposition of the parallel federal claim, it declines to exercise pendent jurisdiction").

single passing reference in a footnote, despite that Plaintiff's Response cites to voluminous admissible evidence, identifying a genuine dispute of fact on all apposite issues.").) Plaintiff further argues that Judge Bloom's reliance on Defendants' testimony and exhibits "is contrary to the command that the role of the court on a motion for summary judgment is not to weigh the evidence or make findings of fact, but to resolve all ambiguities and draw all inferences in the favor of the non-moving party in considering the claims at hand." (Id. (citing Pinto v. Allstate Ins. Co., 221 F.3d 394, 398 (2d Cir. 2000)).)

The court concludes that Judge Bloom recited and applied the proper summary judgment standard. (See R&R at 19-20 (citing Pinto, 221 F.3d at 398).) Moreover, Judge Bloom explained at the opening of the R&R's factual summary that "[u]nless otherwise noted, the following facts are undisputed, taken from [P]laintiff's deposition, or taken in the light most favorable to [P]laintiff." (Id. at 2.) The court will address Plaintiff's specific references to evidence that Judge Bloom purportedly overlooked or failed to credit in connection with its substantive analysis infra.

**B.    Plaintiff's ADA Hostile Work Environment Claim**

In the R&R, Judge Bloom explained that the Second Circuit has not determined whether a hostile work environment claim is cognizable under the ADA, see Adams v. Festival Fun Parks, LLC, 560 F. App'x 47, 51 n.4 (2d Cir. 2014) (summary order); assuming that such a claim is cognizable in the Second Circuit (as it is in other circuits), Judge Bloom concluded that Plaintiff failed to establish that the conditions of her employment were "sufficiently severe or pervasive to create a hostile work environment." (R&R at 21-24.) Cf. Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 102 (2d Cir. 2010) ("In order to establish a hostile work environment claim under Title VII, a plaintiff must produce enough evidence to show that the

13

workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." (internal quotation marks and citation omitted)). Plaintiff objects to Judge Bloom's conclusion, arguing that Judge Bloom overlooked key evidence or failed to consider certain key evidence as admissible. (See Pl. Obj. at 7-14.) Defendants counter that Judge Bloom considered all admissible evidence, and that Plaintiff failed to establish that there was any connection between Plaintiff's disability and the alleged hostile work environment. (See Defs. Resp. at 38-39; see also id. at 27-29.)

"[L]ook[ing] to the record as a whole and assess[ing] the totality of the circumstances," Gorzysnki, 596 F.3d at 102, Judge Bloom properly concluded that there is not a genuine issue of material fact regarding whether the conditions of Plaintiff's employment were sufficiently severe or pervasive to create a hostile work environment. Insensitive, but infrequent, negative comments from a supervisor do not render a workplace hostile. (See R&R at 23 ("District courts in this circuit have not found comments that were more frequent and insensitive than those [P]laintiff endured to be severe or pervasive hostility.").) See, e.g., St. Juste v. Metro Plus Health Plan, 8 F. Supp. 3d 287, 331-32 (E.D.N.Y. 2014) (granting summary judgment to defendants in Title VII hostile work environment case notwithstanding negative comments by defendants concerning plaintiff's religious attire and defendants' refusal to authorize extended lunch break for prayer); St. Louis v. N.Y. City Health and Hosp. Corp., 682 F. Supp. 2d 216, 232-34 (E.D.N.Y. 2010) (granting summary judgment to defendants on hostile work environment claim).

As Judge Bloom explained, Plaintiff relies on infrequent comments by Yussuff concerning her lateness as evidence of a hostile work environment; these comments, however,

were often sent to groups of employees including Plaintiff, and even when sent directly to Plaintiff, were not hostile. (See R&R at 22-23.) Moreover, the fact that Yussuff utilized a "'highly efficient and at times somewhat mercenary' leadership style" (id. at 22 (quoting Venters Dep. at 66:14-15)) does not make the workplace hostile under federal civil rights statutes. See, e.g., Forts v. City of N.Y. Dep't of Corr., No. 00-CV-1716 (LTS) (FM), 2003 WL 21279439, at *4 (S.D.N.Y. June 4, 2013) (amended op.) ("An environment that would be equally harsh for all workers, or that arises from personal animosity, is not actionable under the civil rights statutes."); Garone v. United Parcel Serv., Inc., 436 F. Supp. 2d 448, 469 (E.D.N.Y. 2006) ("The fact that [defendant] apparently had an authoritative management style that [plaintiff], for whatever reason, subjectively viewed as inappropriate does not transform the occasional off-color remark into harassment or strict managerial decision into [discrimination]."), aff'd, 254 F. App'x 108 (2d Cir. 2007) (summary order).

Over a multi-year period, Defendants infrequently emailed Plaintiff regarding her lateness for work (whether due to approved FMLA leave or unexcused); confronted Plaintiff on one occasion when it appeared that she was misusing her FMLA leave to excuse unrelated lateness; and inquired on one occasion whether Plaintiff was still eligible for FMLA leave. Such evidence is not enough for Plaintiff's claim to survive summary judgment. See, e.g., Kemp v. A&J Produce Corp., 164 F. App'x 12, 14-15 (2d Cir. 2005) (summary order) (surveying allegations and evidence in hostile work environment cases that survived summary judgment); McPherson v. NYPO Holdings, Inc., No. 03-CV-4517 (NGG) (LB), 2005 WL 2129172, at *8 (E.D.N.Y. Sept. 1, 2005) ("Three comments made over a period of more than two years amount only to a few isolated incidents, and therefore do not constitute a hostile work environment."), aff'd, 225 F. App'x 51 (2d Cir. 2007) (summary order). Moreover, as Judge Bloom concluded,

15

Plaintiff fails to establish how Defendants' actions—the vast majority of which are facially neutral—relate in any way to her medical condition. (See R&R at 23-24; Aff. of Patricia Jones ("Jones Aff.") (Bernstein Aff., Ex. C (Dkt. 67-3)) ¶¶ 20-28 (describing Yussuff's negative treatment of Plaintiff without any reference to her disability).) See also, e.g., Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2002) (removing list of facially neutral incidents from hostile work environment analysis). Plaintiff does not argue that Yussuff made disparaging remarks about her disability, and simply fails to offer sufficient evidence that Yussuff's comments about her or others' use of FMLA leave objectively rise to the level of "severe or pervasive hostility."

### 1.     Evidence Emphasized by Plaintiff in Objections

Specific evidence that Plaintiff emphasizes in her objections does not affect the hostile work environment analysis.[8] Plaintiff focuses on a set of emails that Yussuff sent to Plaintiff in 2010 and 2011. (See Pl. Obj. at 9-11.) Plaintiff argues that Judge Bloom incorrectly deemed these emails to be "not hostile." (Cf. R&R at 23.) But the emails speak for themselves; they are either communications by Yussuff to all individuals in Plaintiff's position requesting employees

---

[8]  Certain evidence to which Plaintiff points was expressly considered by Judge Bloom in the R&R. For example, Plaintiff argues that the R&R "does not consider Yussuff's revocation of [Plaintiff's] FMLA leave in the Spring of 2010 as part of her hostile work environment claim." (Pl. Obj. at 8.) But Judge Bloom did consider this purported evidence, and, like this court, determined that Plaintiff's FMLA leave was never, in fact, revoked. (See R&R at 5, 41.) Similarly, Plaintiff argues that an email in which Yussuff acknowledged Plaintiff's FMLA status demonstrates his discriminatory animus. (Pl. Obj. at 13-14.) But Judge Bloom considered the email in question, along with other emails sent by Yussuff. (See R&R at 6.) And in any event, the November 18, 2009, email does not demonstrate animus, but instead shows that Defendants attempted to reasonably accommodate Plaintiff's disability while also ensuring that she did not report late for unexcused reasons, a fact that demonstrably occurred over the course of Plaintiff's employment. (See id. at 24.)

Plaintiff also argues that Judge Bloom ignored evidence that Yussuff sabotaged her performance and denied her resources that he later provided to Plaintiff's replacement. (Pl. Obj. at 11.) Judge Bloom considered this allegation in connection with the analysis of Plaintiff's demotion. (See R&R at 30 ("Plaintiff asserts that Yussuff sabotaged her by refusing to provide supplies and aid she requested and cites the affidavit of a former colleague, Patricia Jones, who corroborates that [P]laintiff complained about maintenance issues [and] the failure to receive requested supplies.").) Judge Bloom did not overlook this testimony; rather, she pointed out that Plaintiff conceded during her deposition that "she was ultimately responsible if others failed to remedy maintenance of supplies issues." (Id. (quoting Pl. Dep. at 296:5-297:2).) At bottom, Plaintiff's insinuation of sabotage by Defendants is insufficient to establish either pretext or a hostile work environment claim at the summary judgment stage. See, e.g., Taylor v. Polygram Records, No. 94-CV-7689 (CSH), 1999 WL 124456, at *12 (S.D.N.Y. Mar. 8, 1999) ("sweeping assertions" that supervisor prevented plaintiff from performing her job are insufficient).

to arrive on time, or communications from Yussuff to Plaintiff seeking additional information about her late arrivals—emails sent in light of questions about Plaintiff's misuse of her FMLA leave. (See R&R at 23 ("Despite [P]laintiff's ability to correct Sick Logs—a right she regularly exercised—no reason was provided for 33 of her latenesses in 2008, 48 in 2009, 46 in 2010, and 14 in 2011." (internal citation omitted)); id. at 24 ("The evidence does not support [P]laintiff's claim that Yussuff's and McNerney's comments to her were discriminatory; on the contrary, their comments demonstrate their concerns that the workplace would suffer from inadequate staffing in [P]laintiff's absence.").)

Plaintiff points to her October 2010 termination and re-hiring as evidence of a hostile work environment. (Pl. Obj. at 15-16, 18-19.) For example, Plaintiff claims that DOH responded to the termination by stating that merging the HSA position with a clinical position was a "bad idea." (Id. at 16.) The evidence shows, however, that while DOH did not think terminating Plaintiff's employment would solve the NIC's problems at that time, it did believe that reorganization was a "good idea" and that the Defendants needed a more comprehensive plan for improving the NIC. (Defs. Resp. at 33-34 (quoting Venters Dep. at 38:14-39:10).) And, according to Venters, the reason the termination was a "bad idea" at the time was "because there had been no preparation for" the transition (Venters Dep. at 39:25-40:1), not because DOH believed Plaintiff's role at the NIC was indispensable or irreplaceable.

Plaintiff further argues that although Defendants stated that the October 2010 termination was due to Plaintiff's lack of a master's degree and clinical experience, the current HSA only has a master's degree in public administration, and not a clinical degree. (Pl. Obj. at 29.) Plaintiff ignores, however, that her immediate replacement upon her demotion did have a master's degree in nursing. (See R&R at 12.) Finally, Plaintiff points to Doherty's statement in an email that,

upon the eventual hiring of a new Director of Infirmary Services, Plaintiff would no longer serve

as HSA of NIC and that "upon the transition, she will be given an assignment appropriate to her

title." (Pl. Obj. at 18 (quoting Oct. 20, 2010, Email from Doherty (Bernstein Aff., Ex. I (Dkt. 67-

3))).) Without legal citation, Plaintiff argues that by later demoting her, Doherty "broke his

promise" to transfer Plaintiff to an appropriate HSA position outside of the NIC. (Id. at 19.) But

Plaintiff ignores the intervening series of events between October 2010 and her April 2011

demotion—namely, Plaintiff's poor 2010 performance review, continued complaints from DOH

concerning the NIC, and complaints from PHS executive staff concerning the operation of the

NIC.

### 2. Hearsay Analysis

In the portion of the R&R addressing Plaintiff's ADA discrimination claim, Judge Bloom

noted that "to the extent [the affidavits of Plaintiff's former co-workers] recount comments made

by Yussuff or other third parties, they rely on inadmissible hearsay and are therefore

inadmissible." (R&R at 30 n.21.) Plaintiff objects, arguing that statements by Yussuff and

Doherty, recounted in the Jones and Bosworth affidavits, are admissible as party admissions, and

that these statements show that in "aggregate," the workplace was hostile to those with

disabilities. (See Pl. Obj. at 11.)

Federal Rule of Evidence 801 provides that a statement is not hearsay if it is "offered

against an opposing party and . . . was made by the party's agent or employee on a matter within

the scope of that relationship while it existed." Fed. R. Evid. 801(d)(2)(D). "Admissibility

under this rule should be granted freely." Pappas v. Middle Earth Condo. Ass'n, 963 F.2d 534,

537 (2d Cir. 1992). The proponent of the evidence must establish, through direct or

circumstantial evidence, "(1) the existence of the agency relationship, (2) that the statement was

made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency." Id. A "declarant need not be the 'final decisionmaker' on employment matters for his statement on those matters to be deemed within the scope of his agency." United States v. Rioux, 97 F.3d 648, 661 (2d Cir. 1996). "Rather, he need only be an advisor or other significant participant in the decision-making process that is the subject matter of the statement." Id.

Under this standard, certain of the statements of others contained in the Jones and Bosworth affidavits are admissible as non-hearsay admissions, while others are inadmissible.[9] See Zaken v. Boerner, 964 F.2d 1319, 1323 (2d Cir. 1992) (examining each proffered statement individually under Rule 801(d)(2)(D)). The court deems the following statements admissible for purposes of this motion for summary judgment. Jones declared that Deputy Director of Mental Health Andrea Harris stated during a team meeting that occurred sometime in 2010 or 2011 that "Fazal Yussuf[f] was going to form a committee to review FMLA applications and people who were on FMLA leave because there were too many employees on FMLA leave and FMLA was being abused." (Jones Aff. ¶ 16.) Similarly, during "the last six months of 2010 and the first few months of 2011," Jones attended an executive staff meeting in which "Fazal Yussuf[f] stated that there were too many people on FMLA leave and that people were abusing FMLA leave. Mr. Yussuf[f] made this comment in the context of a discussion about time and attendance." (Id. ¶ 19.) Bosworth also declared that during a 2010 meeting, "Don [Doherty] and Fazal [Yussuff] discussed that Rikers Island has more staff on FMLA leave than any other facility, and that they needed to do something to reduce the number of people on FMLA leave." (Aff. of John

---

[9] To the extent this Memorandum and Order considers statements deemed inadmissible by the R&R, the R&R is so modified.

Bosworth ("Bosworth Aff.") (Bernstein Aff., Ex. 4 (Dkt. 67-3)) ¶ 2.)[10] The court notes that

Bosworth provided little information in his three-paragraph affidavit to demonstrate the basis for

his personal knowledge regarding the matters to which he swore. Cf. Fed. R. Evid. 602.

Other statements contained in the affidavits are inadmissible hearsay. For example,

Bosworth declared that during the summer of 2010, Benjamin Roman, at the time Yussuff's

assistant, "told me that Fazal [Yussuff] put his feet up on his desk, leaned back in his chair, and

declared that he was going to get rid of Bernice Forrester and Irene Leiben, and that he had me

right where he wanted." (Bosworth Aff. ¶ 3.) This statement contains hearsay within hearsay,

and Plaintiff has failed to demonstrate that the statement by Roman fits within the agency

parameters of Rule 801. Other statements included in the affidavits contain remarks made by

Plaintiff (see, e.g., Jones Aff. ¶ 22 ("[Plaintiff] told me that Mr. Yussuf[f] was harassing her

about time and attendance, despite her FMLA leave."), or both the hearsay statements of Plaintiff

and non-hearsay statements of Yussuff (see, e.g., id. ¶ 30 ("I heard [Plaintiff] tell Mr. Donahue

that she wanted to file a formal complaint about Mr. Yussuf[f] for his harassment of her in

emails, conversations and meetings related to her time and attendance and work performance,

and his treatment of her in public. . . . [Plaintiff] pleaded with Mr. Donahue, asking why she was

still getting these emails about coming in [late] when she was late-FMLA or out with earned sick

time.")). These statements are inadmissible, as Plaintiff has not established that her prior

statements to Jones are admissible, or that each layer of hearsay is admissible for those

statements she made to Jones regarding prior statements by Yussuff. See also Fed. R. Evid. 805

[10] The court also admits as evidence for purposes of this motion certain vicarious admissions contained in Plaintiff's affidavit, including that "[Yussuff] stated on numerous occasions that he thought too many people were on FMLA leave, and that he was going to form a committee to 'review the FMLAs' to pare down the FMLA rolls." (Aff. of Bernice Forrester ("Pl. Aff.") (Bernstein Aff., Ex. 5 (Dkt. 67-3)) ¶ 22.)

("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule.").

Even if the record includes the admissible statements contained in the affidavits, a rational jury could not find that Defendants' conduct was so severe or pervasive as to create a hostile work environment. Although Plaintiff claims in her affidavit that Yussuff stated on "numerous" occasions that too many people were on FMLA leave (see Pl. Aff. ¶ 22), she failed during her deposition to point to any specific communications by Yussuff beyond the facially neutral and infrequent emails discussed above (see Pl. Dep. at 163:2-164:20). See also Hayes v. N.Y. City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."). Similarly, although Plaintiff states that upon receiving her FMLA leave, "[Yussuff] sent me nasty emails criticizing me for being late on days when my blood sugar levels were off" (Pl. Aff. ¶ 13), she failed to identify any additional emails beyond those discussed during her deposition and throughout the R&R (see Pl. Dep. at 177:23-178:17 ("Q: I'm going to represent that out of the documents [Plaintiff's lawyer produced in discovery] these are the three e-mails we could locate which are addressed to you. . . . These are the three we have found that appear—where Mr. Yussuf[f] is questioning why you're being late for work. . . . Do you recall there being any others as you sit here today? A: I don't know. I don't remember."); cf. id. at 173:25-175:19 (alleging in conclusory fashion that "hundreds" of emails sent by Yussuff to Plaintiff were missing due to an apparent computer "glitch")). Other contentions in Plaintiff's affidavit, such as "[Yussuff] would criticize me for taking leave in person" (Pl. Aff. ¶ 13), are too conclusory to credit. See, e.g., Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) (disregarding plaintiff's contention that defendant made

21

"disparaging remarks about Jews" and "misconceived [her] work habits because of his subjective prejudice against [her] Jewishness" because, "allow[ing] a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases." (first two alterations in original)).

Finally, Plaintiff relies on additional evidence contained in the Jones affidavit unrelated to the hearsay analysis. (See Pl. Obj. at 7-8, 11-13.) Jones stated, among other things:

> I witnessed [Plaintiff] become increasingly traumatized by Fazal Yussuf[f]. . . . During this time period, [Plaintiff] would return from one-on-one and group meetings with Fazal Yussuf[f] ashen and physically shaking. Sometimes she would come to my office instead of returning to her own office directly after these meetings, close the door, and just cry. [Plaintiff] told me that Mr. Yussuf[f] was openly hostile to her at these meetings, and that he was demeaning and insulting to her . . . ."

(Jones Aff. ¶¶ 20-22.) Although Judge Bloom did not expressly reference this evidence in her hostile work environment analysis, it does not affect the analysis, due to the lack of any connection between Yussuff's purported mistreatment of Plaintiff and her disability.

For these reasons, the court adopts Judge Bloom's recommendation and GRANTS summary judgment to Defendants on Plaintiff's ADA hostile work environment claim.

## C.    Plaintiff's ADA Discrimination and Retaliation Claims

The court next turns to Plaintiff's discrimination and retaliation claims under the ADA. Although the court clarifies the proper legal standard to apply to Plaintiff's claims, it ultimately ADOPTS Judge Bloom's recommendation that the court grant summary judgment to Defendants on both of these claims.

### 1.    Legal Standard for ADA Discrimination Claims

Neither the parties' briefing nor the R&R fully set forth the nuanced—and at times confusing—legal standards governing ADA discrimination claims. Judge Bloom's analysis

noted that it is an "open question" in this circuit whether Plaintiff can satisfy her burden by showing that her disability was a "substantial" or "motivating" factor in the adverse employment action, rather than the "but-for" cause. (See R&R at 28 n.20.) Given the uncertainty in this area of the law and the lack of clear guidance from the Second Circuit after the Supreme Court's decision in Gross v. FBL Financial Services, Inc., 557 U.S. 167 (2009) (requiring a showing of but-for causation for age discrimination claims under the ADEA and foreclosing a mixed-motive approach), Judge Bloom stated that Plaintiff's claims fail under both the mixed-motive standard and the familiar framework of McDonnell Douglas burden shifting. (R&R at 28 n.20.) See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). While the bulk of the R&R's analysis concerns the final step of the McDonnell Douglas framework—pretext—the court interprets footnote 20 of the R&R as holding that Plaintiff failed to satisfy her burden at the summary judgment stage under either McDonnell Douglas or the Plaintiff's proposed mixed-motive standard. However, the court finds it helpful to clarify the relevant standards in more detail, and therefore MODIFIES the R&R to the extent it applied a legal standard different from the standard outlined and utilized below.

a. *Pretext Analysis Compared to Mixed-Motive Approach*

"Employment discrimination cases (whether brought under [T]itle VII or the ADEA [or the ADA]) are frequently said to fall within one of two categories: 'pretext' cases and 'mixed-motives' cases." Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1180 (2d Cir. 1992).[11] In a pretext case—analyzed under the framework established by the Supreme Court in McDonnell Douglas—a plaintiff first must establish a prima facie case, which "is not onerous," Tex. Dep't

---

[11] As discussed infra, the court recognizes that the Supreme Court's holding in Gross forecloses a mixed-motive approach in ADEA cases, and therefore abrogates numerous Second Circuit cases applying the approach to claims of age discrimination, including Tyler. However, because the mixed-motive approach remains viable in this circuit in connection with other types of employment discrimination, the Second Circuit's reasoning in these cases remains good law and is referenced throughout this section of the Memorandum and Order.

23

of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981), and which is not at issue in this Memorandum and Order. The defendant must next "articulate (not prove), via admissible evidence, a legitimate reason for the employment decision," Tyler, 958 F.2d at 1181; again, this is not at issue in this Memorandum and Order. Ultimately—and at issue here—the plaintiff has an opportunity to persuade "the trier of fact that a discriminatory reason more likely than not motivated the employer, or . . . that the employer's proffered explanation is unworthy of belief." Id. (citing Burdine, 450 U.S. at 256). At this last step, the "pretext" stage, it is not enough for a plaintiff "merely to create doubt that [the defendant's] stated reason was the real reason" for the adverse employment actions; rather, she "must also put forth 'evidence that would permit a rational factfinder to infer that the discharge was actually motivated, in whole or in part, by discrimination' on the basis of" her disability. Vahos v. Gen. Motors Corp., No. 06-CV-6783 (NGG) (SMG), 2008 WL 2439643, at *4 (E.D.N.Y. June 16, 2008) (quoting Grady v. Affiliated Cent., Inc., 130 F.3d 553, 561 (2d Cir. 1997)).

Under the mixed-motive approach, first outlined by the Supreme Court in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), the plaintiff's opening burden is greater than in establishing a prima facie case under McDonnell Douglas; the plaintiff must initially "focus his proof directly at the question of discrimination and prove that an illegitimate factor had a 'motivating' or 'substantial' role in the employment decision." Tyler, 958 F.2d at 1181 (quoting Price Waterhouse, 490 U.S. at 246 (plurality op.)). If the plaintiff makes such a showing, the burden is on the defendant to prove its affirmative defense "'that it would have reached the same decision as to [the employee's employment] even in the absence of the'" impermissible, discriminatory factor. Id. (quoting Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)). In other words, in a mixed-motive case, "the plaintiff can satisfy his

24

entire burden of proof by initially producing evidence sufficient to demonstrate that discrimination was 'in fact a "motivating" or "substantial" factor in the employment decision.'" Vahos, 2008 WL 2439643, at *4 n.5 (quoting De la Cruz v. N.Y. City Human Res. Admin. Dep't of Soc. Servs., 82 F.3d 16, 24 (2d Cir. 1996) (emphasis in original)). "The only evidence sufficient to satisfy this burden is evidence that 'directly reflects' a discriminatory motivation, like 'policy documents and evidence of statements or actions by decisionmakers' that constitute a 'smoking gun' or, at the very least, a 'thick cloud of smoke.'" Id. (quoting Raskin v. Wyatt Co., 125 F.3d 55, 60-61 (2d Cir. 1997)); cf. Price Waterhouse, 490 U.S. at 250 (plurality op.) ("In saying that gender played a motivating part in an employment decision, we mean that, if we asked the employer at the moment of the decision what its reasons were and if we received a truthful response, one of those reasons would be that the applicant or employee was a woman."); id. at 277 (O'Connor, J., concurring) ("Thus, stray remarks in the workplace, while perhaps probative of sexual harassment, cannot justify requiring the employer to prove that its hiring or promotion decisions were based on legitimate criteria. Nor can statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard." (internal citation omitted)).

Although the evidence offered by a plaintiff in a mixed-motive case must "directly reflect[] the alleged discriminatory attitude," Raskin, 125 F.3d at 60-61 (internal quotation marks and citation omitted), it need not be "direct evidence" in the traditional sense, and inferences by the factfinder are permitted. See Tyler, 958 F.2d at 1183-86 (noting confusion arising from use of the term "direct" and that even a statement such as "'You're fired, old man' still requires the factfinder to draw the inference that the plaintiff's age had a causal relationship with the decision"); see also, e.g., Holcomb v. Iona Coll., 521 F.3d 130, 134, 142 (2d Cir. 2008)

(applying mixed-motive approach where plaintiff (who alleged his employment was terminated based on the race of his wife) alleged that decisionmaker responded to his wedding invitation by stating "[Y]ou're really going to marry that Aunt Jemima? You really are a nigger lover" (alternation in original)); Danzer v. Norden Sys., Inc., 151 F.3d 50, 53-54 (2d Cir. 1998) (applying mixed-motive approach where management prepared a chart tracking the ages of the relevant staff members, referred to them as "alte cockers" and "old fogies," and stated that the company needed "new and younger blood" in order to compete).

Plaintiff argues that Judge Bloom erred in only applying the McDonnell Douglas framework to her ADA claims, rather than also analyzing the mixed-motive approach. (Pl. Obj. at 6-7.) Plaintiff is correct that in the past, the Second Circuit has authorized the use of a mixed-motive approach to ADA claims. See, e.g., Parker v. Columbia Pictures Indus., 204 F.3d 326, 336 (2d Cir. 2004). Plaintiff is also correct that amendments to the ADA effective as of January 1, 2009, substituted "on the basis of" for "because of" in the ADA's statutory text. See 42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." (emphasis added)). And Plaintiff is correct that in light of amendments to the ADA, it is not clear whether the Supreme Court's analysis in Gross—which applied a but-for causation standard to ADEA claims based on the ADEA's statutory text—also applies to ADA claims and forecloses the mixed-motive approach. See Wesley-Dickson v. Warwick Valley Cent. Sch. Dist., 586 F. App'x 739, 745 n.3 (2d Cir. 2014) (summary order) (noting uncertainty in standard after Gross); Bolmer v. Oliveira, 594 F.3d 134, 148-49 (2d Cir. 2010) (same); Sherman v. Cnty. of Suffolk, No. 11-CV-2528 (ADS) (SIL), 2014 WL 7370033, at *13

(E.D.N.Y. Dec. 29, 2014) (collecting cases from district courts within the Second Circuit and referencing lack of clarity); cf. Gross, 557 U.S. at 179 ("Whatever the deficiencies of Price Waterhouse in retrospect, it has become evident in the years since that case was decided that its burden-shifting framework is difficult to apply.").

Absent guidance from the Second Circuit, the court does not conclude that the mixed-motive analysis in an ADA discrimination case is foreclosed by Gross.[12]  On the one hand, the mixed-motive approach can be viewed as overlapping with McDonnell Douglas burden-shifting, at least in a situation where the plaintiff has successfully raised a prima facie case and the defendant has adequately proffered a legitimate justification for the employment action.  This is because the evidence required to satisfy the initial burden under the mixed-motive analysis can mirror the evidence required to rebut a defendant's proffered justifications under the third step of the McDonnell Douglas framework.  See, e.g., Vahos, 2008 WL 2439643, at *4 n.5 ("As there is no difference between the plaintiff's initial burden under Price Waterhouse and the plaintiff's ultimate burden under McDonnell Douglas, and because the court will now determine whether [plaintiff] has met his ultimate burden under McDonnell Douglas, the court will not separately analyze his claims under Price Waterhouse.").  Moreover, once a plaintiff has satisfied her burden of establishing a prima facie case, and once the defendant proffers a legitimate, nondiscriminatory reason for the challenged employment action, "the presumption raised by the

---

[12]  With respect to Plaintiff's ADA retaliation claim, the mixed-motive approach is likely foreclosed by the Supreme Court's analysis in University of Texas Southwestern Medical Center v. Nassar, 133 S.Ct. 2517 (2013), in which the Court held that for a Title VII retaliation claim (as opposed to a Title VII discrimination claim), a plaintiff must establish that the unlawful retaliation was a but-for cause of the adverse employment action, and not just a "substantial" or "motivating" factor.  See also Kwan v. Andalex Grp. LLC, 737 F.3d 834, 845 (2d Cir. 2013) (citing Nassar in connection with McDonnell Douglas analysis of Title VII retaliation claim).  The ADA retaliation provision contains language materially similar to the Title VII retaliation provision analyzed in Nassar.  See 42 U.S.C. § 12203(a) ("No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." (emphases added)).

prima facie case is rebutted, and drops from the case." Bickerstaff v. Vassar Coll., 196 F.3d 435,

446 (2d Cir. 1999) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993)). In other

words, at this point, the first two steps become "irrelevant," St. Mary's, 509 U.S. at 507, and

"[t]he plaintiff's opportunity to demonstrate that the employer's proffered reason was false now

merges with her ultimate burden to persuade the trier of fact that she has been the victim of

intentional discrimination (i.e., that an illegal discriminatory reason played a motivating role in

the adverse employment decision)." Bickerstaff, 196 F.3d at 446-47.[13]

Thus, under either the mixed-motive approach or the McDonnell Douglas framework, the

court's ultimate task is to determine whether Plaintiff presented "sufficient admissible evidence

from which a rational finder of fact could infer that more likely than not she was the victim of

intentional discrimination." Id. at 447 (citing St. Mary's, 509 U.S. at 507, 511). Or, as Judge

Shira A. Scheindlin has explained in apparent frustration:

> Having outlined these parallel lines of inquiry, I note that in this
> case (as in so many others), the various burden shifts described
> shed little, if any, light on the question to be decided. . . . When all
> the burdens finish shifting, then, it becomes apparent that the sole
> issue presented by this motion [for summary judgment] is the
> 'ultimate issue' in every Title VII case: Whether the plaintiff has
> presented evidence from which a rational finder of fact could

---

[13] Thus, in the context of analyzing the proper jury instructions for an employment discrimination case, the Second Circuit has noted:

> The Price Waterhouse principle often leads to the paradoxical situation, as it did in the present case, of a plaintiff asking for a mixed-motive instruction. The Price Waterhouse issue does not arise for the trier of fact until the plaintiff has carried the burden of persuading the trier that the forbidden animus was a motivating factor in the employment decision but has failed to persuade the trier that non-discriminatory reasons proffered by the employer were pretexts and not also motivating factors. Once the presentation of evidence is sufficient to create this possibility, the employer has the option of defending on the Price Waterhouse ground that it would have made the same decision even in the absence of a discriminatory motive.

Ostrowski v. Atl. Mut. Ins. Cos., 968 F.2d 171, 181 (2d Cir. 1992). In other words, "the jury must be told that the mixed-motive issue does not arise unless it first determines that the plaintiff has carried the burden of proving a forbidden motive but has failed to prove that the employer's explanations were pretextual." Id.

> conclude that the defendant discriminated against her illegally.
> Rather than dance mechanistically through the <u>McDonnell Douglas</u>
> and <u>Price Waterhouse</u> 'minuets,' therefore, I will proceed directly
> to the ultimate issue.

<u>Jalal v. Columbia Univ. in the City of N.Y.</u>, 4 F. Supp. 2d 224, 233-34 (S.D.N.Y. 1998) (internal

citations omitted).

On the other hand, even if the two approaches merely represent different methods of

conceptualizing the same inquiry (whether an illegal discriminatory reason played a motivating

role in an adverse employment decision), the Second Circuit has repeatedly considered them

separately. See, e.g., <u>Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.</u>, 715 F.3d 102, (2d

Cir. 2013) (reversing district court's summary judgment determinations that plaintiff failed to

offer sufficient evidence under either pretext or mixed motives inquiries); <u>Raskin</u>, 125 F.3d at 60

("On appeal, [plaintiff] makes arguments under both the <u>Price Waterhouse</u> and <u>McDonnell</u>

<u>Douglas</u> frameworks, and we address those arguments separately."); <u>De la Cruz</u>, 82 F.3d at 16

(separately analyzing evidence supporting plaintiff's assertions of pretext and mixed motive).

But see, e.g., <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 44-45 (2d Cir. 2000) (analyzing <u>Price</u>

<u>Waterhouse</u> and lack of "direct evidence" in connection with pretext analysis under <u>McDonnell</u>

<u>Douglas</u> framework).

Thus, Judge Bloom should have considered whether Plaintiff met her burden under either

the <u>McDonnell Douglas</u> framework or the mixed-motive approach. The court will review

Plaintiff's objections to Judge Bloom's pretext analysis under <u>McDonnell Douglas</u>, but will first

conduct a de novo review of whether Plaintiff offered sufficient evidence to meet her burden

under the mixed-motive approach. Under both frameworks, the court applies a "motivating" or

"substantial" factor standard of causation to Plaintiff's claims, and does not apply the more

stringent standard of but-for causation. While Judge Bloom also applied a motivating or

substantial factor standard of causation to her pretext analysis, to the extent that she did not expressly consider the mixed-motive approach, the R&R is MODIFIED.

        b.     *Application of Mixed-Motive Approach in This Case*

While it is a closer question with respect to Plaintiff's demotion than with respect to her suspension and termination, the court finds that Plaintiff has failed to offer sufficient evidence to satisfy her initial burden under the mixed-motive approach. As described more fully above in connection with the court's analysis of the hostile work environment claim, Plaintiff primarily points to statements by Yussuff concerning employees' use of FMLA leave and concerning Plaintiff's late arrival to work as the direct evidence she needs to succeed under the mixed-motive approach. See supra Part V.B. But of these statements, only certain are admissible as evidence, and none amount to the "smoking gun" or "thick cloud of smoke" required for a plaintiff to carry her initial burden under the mixed-motive approach.

As a threshold issue, unlike an employer's open discussion of an employee's race or gender, comments about an employee's FMLA leave cannot be inappropriate per se, as the ADA and FMLA encourage employers and employees to discuss an employee's disability and arrive at a reasonable accommodation or manner of intermittent FMLA leave. Cf. De la Cruz, 82 F.3d at 23 (supervisor's comment that problems were "cultural"—made "in the context of a justified concern over language skills and problems arising out of transliteration"—were not evidence of national origin discrimination in mixed-motive case). Thus, the fact that Yussuff discussed FMLA leave with management, or contacted Human Resources to question Plaintiff's eligibility at one point, cannot serve as the direct evidence of a mixed-motive in this case.

Moreover, with respect to the most questionable of Yussuff's comments (a statement that there were too many people on FMLA leave and that people were abusing FMLA leave),

Plaintiff has failed to offer evidence that Yussuff's alleged discriminatory animus "was in fact a motivating or substantial factor in" Defendants' later decision to demote her, Raskin, 125 F.3d at 63 (emphasis in original) (internal quotation marks and citation omitted), which did not occur in connection with Yussuff's comments and which followed Defendants' clear warning to Plaintiff that she would remain as HSA of the NIC on only a temporary basis. See Holleman v. Art Crating Inc., No. 12-CV-2719 (VMS), 2014 WL 4907732, at *44 & n.53 (E.D.N.Y. Sept. 30, 2014) (rejecting mixed-motive approach where, "[a]lthough [speaker with alleged bias against women] was a decisionmaker, his comments bear no connection to the employment decision which might support a finding of discriminatory motive").

This case contrasts with cases in which summary judgment was denied under the mixed-motive approach. Here, there is no indication that Yussuff or anyone else comingled express concerns about Plaintiff's disability or FMLA status with her actual demotion. Instead, Plaintiff was ultimately demoted following a negative formal performance evaluation and comments by Defendants' executive staff and the independent DOH that the NIC was performing poorly. Compare, e.g., Manon v. 878 Educ., LLC, No. 13-CV-3476 (RJS), 2015 WL 997725, at *3 (S.D.N.Y. Mar. 4, 2015) (in ADA case related to plaintiff's disabled child, supervisor stated during plaintiff's termination meeting "that he needed to hire someone without children" and asked, "How can you guarantee me that [] two weeks from now your daughter is not going to be sick again? . . . So, what is it, your job or your daughter?" (alterations in original)); Greenidge v. Costco Wholesale, No. 09-CV-4224 (RRM) (LB), 2012 WL 1077455, at *3 (E.D.N.Y. Mar. 30, 2012) (in gender and pregnancy discrimination case, management allegedly told plaintiff during termination meeting that "there was no way they could keep [her] working there in [her] state of pregnancy and that in time [she] would not be able to do any work" (alterations in original));

31

Gonzalez v. Rite Aid of N.Y., Inc., 199 F. Supp. 2d 122, 132 (S.D.N.Y. 2002) (Chin, J.) (in ADA case, management informed plaintiff that he was not being promoted "because of his health" and therefore "the record contain[ed] direct evidence that [defendant] denied [plaintiff] the promotion because of his impairment (or perceived impairment)").

What further distinguishes this case from those in which plaintiffs satisfied their burdens under the mixed-motive approach is Plaintiff's failure to point to any policy documents reflecting discriminatory animus. Compare, e.g., Weber v. FujiFilm Med. Sys. U.S.A., Inc., 854 F. Supp. 2d 219, 232 (D. Conn. 2012) (denying summary judgment under mixed-motive approach in national origin discrimination case due in part to company memoranda discussing "plan to recover control over management from American staff members"); Ames v. Cartier, Inc., 193 F. Supp. 2d 762, 768-69 (S.D.N.Y. 2002) (denying summary judgment under mixed-motive approach where plaintiff sales associate pointed to sales policy that "white male customers were to be served by white female sales associates"). Thus, with respect to Plaintiff's demotion, the court concludes that she has failed to offer evidence sufficient to meet her initial burden under the mixed-motive approach, and therefore her claims must be analyzed under McDonnell Douglas.

The same is true regarding Plaintiff's subsequent suspension and termination. In fact, Plaintiff offers nothing close to "smoking gun" evidence in connection with these actions (with which Yussuff was not involved). Thus, Plaintiff fails to meet her burden under the mixed-motive approach in connection with her suspension and termination. Rather, as with Plaintiff's claims related to her demotion, the court will apply the McDonnell Douglas framework, focusing, as Judge Bloom did, on the third stage of the analysis,[14] and on the ultimate issue in

---

[14] At this stage in the proceeding, Defendants do not argue that Plaintiff has failed to raise a prima facie case of discrimination. To establish a prima facie case, "a plaintiff must show by a preponderance of the evidence that: '(1)

any employment discrimination case: whether Plaintiff presented "sufficient admissible evidence from which a rational finder of fact could infer that more likely than not she was the victim of intentional discrimination." Bickerstaff, 196 F.3d at 447.

### 2. Plaintiff's Fact-Based Objections to Judge Bloom's Pretext Analysis

The bulk of Plaintiff's objections focus on the evidence supporting her position that the three alleged adverse employment actions—Plaintiff's demotion, and later her suspension and termination—were motivated, at least in part, by unlawful discrimination, and not by the justifications proffered by Defendants during stage two of the McDonnell Douglas analysis.

#### a. *Demotion*

In 2011, Defendants demoted Plaintiff from the position of HSA to Administrative Assistant to HSA. (See R&R at 10-12.) With respect to Plaintiff's disability discrimination claim, Judge Bloom concluded that Plaintiff failed to establish pretext, since "attendance problems related to her disability did not alone cause her demotion." (Id. at 28.) Plaintiff generally argues that she has made a sufficient showing of pretext, since "Plaintiff's disability affected her attendance, which contributed to a low attendance score on her 2010 review, and in turn Defendants relied upon Plaintiff's 2010 review in demoting [Plaintiff]." (Pl. Obj. at 22.) Plaintiff's specific objections are addressed below. In sum, the court finds that Plaintiff has failed to offer sufficient evidence to permit the inference "that an illegal discriminatory reason played a motivating role" in the demotion. Bickerstaff, 196 F.3d at 446-47. See also Schnabel v.

---

his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability.'" Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006) (quoting Giordano v. City of N.Y., 274 F.3d 740, 747 (2d Cir. 2001)). Thus, for purposes of this motion, there is no dispute that Defendants are subject to the ADA, Plaintiff was "disabled" within the meaning of the ADA, Plaintiff was otherwise qualified to perform her job, and Plaintiff suffered an employment action that could qualify as an adverse employment action. (See R&R at 24-27 (holding that Plaintiff met her minimal burden of establishing a prima facie case as to her demotion, suspension, and termination, notwithstanding Defendants' arguments regarding Plaintiff's qualifications).)

Abramson, 232 F.3d 83, 90 (2d Cir. 2000) (requiring courts to "examin[e] the entire record to determine whether the plaintiff could satisfy her 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)).

          i.    Plaintiff's job performance as HSA of the NIC

     Plaintiff argues that her "purportedly poor performance is in genuine dispute," and refers to her Response to Defendants' Statement of Undisputed Material Facts. (Pl. Obj. at 22-24; see also id. at 14-15.) Defendants respond that Plaintiff grossly misconstrues the evidentiary record, both with respect to her assigned duties and the performance of those duties. (Defs. Resp. at 20-21.) Having reviewed the evidence cited by the parties, the court agrees with Judge Bloom: "Even setting [P]laintiff's 2010 performance review aside [see infra Part V.C.2.iii], an abundance of emails show that [P]laintiff failed to properly supervise the NIC between 2010 and 2011. Those detailed complaints, from both DOH and patients, include the failure to properly stock nurse's stations, ensure compliance with hand-washing procedures, adequately staff the NIC, address the 'second-opinion box' requests, and properly track patients' admission, placement, and follow-up appointments." (R&R at 30; see also id. at 10-11 (cataloging issues in the NIC during Plaintiff's tenure as HSA).) Moreover, the fact that Venters—an administrator at DOH and not an employee of Defendants—recommended changing all leadership positions in the NIC, including Plaintiff as HSA, corroborates Defendants' view that Plaintiff performed poorly, and that Defendants' reasons for demoting her are not pretext. (See Defs. Resp. at 21 (citing Venters Dep. at 44:2-11).) See also, e.g., Saenger v. Montefiore Med. Ctr., 706 F. Supp. 2d 494, 509 (S.D.N.Y. 2010) ("[T]he Court finds that the multitude of serious, independent, documented, and therefore good faith complaints against Plaintiff undermine any attempt to

paint Defendant's stated reason for dismissing Plaintiff as trumped-up or pretextual. In fact, given the grave concerns regarding Plaintiff's behavior towards female employees, Defendant could reasonably have feared that not terminating Plaintiff could have subjected the hospital to liability.").

To be clear, the court does not view Plaintiff's performance as the sole reason for the issues that plagued the NIC during her tenure as HSA; as Plaintiff points out, others (including Plaintiff's supervisor, Yussuff) share some responsibility. But the fact that others may have also performed their roles poorly does not demonstrate that Defendants' reasons for demoting Plaintiff lacked legitimacy; nor does whether Plaintiff complained to Yussuff about the quality of the doctors assigned to the NIC (see Pl. Obj. at 23), or whether DOH at one point noted that the staff of the NIC needed greater support from Defendants' leadership (see id.). And the evidentiary record does not reflect, as Plaintiff claims without citation, "that Yussuff knew the issues [in the NIC] were not [Plaintiff's] fault, permitting the inference that Yussuff's reliance on such issues is pretextual." (Id. at 22.)

Plaintiff also argues that there is a genuine factual dispute concerning Plaintiff's attendance records. (See id. at 19-21.) Plaintiff strongly objects to the manner in which Judge Bloom calculated her rate of lateness, arguing that timesheets indicating that Plaintiff was late "do not speak for themselves" and that a jury could credit Plaintiff's testimony that the timesheets are inaccurate. (Id. at 20.) Plaintiff further objects to the fact that the court engaged in such a calculation at all. (Id. at 21.) These objections notwithstanding, the court adopts Judge Bloom's methodology and analysis. (See R&R at 23-24.) Moreover, regardless of the source of information used to analyze Plaintiff's lateness (Sick Call logs or her clock-in time), the record

demonstrates that Plaintiff failed properly to report her lateness in accordance with Defendants' policies, even if each occurrence of lateness was due to FMLA leave.

Plaintiff argues that Judge Bloom's "erroneous conclusion is crucial, because the R&R goes on to dismiss numerous instances of Defendants harassing Plaintiff for her FMLA/disability related leave as justified on the assumption of Plaintiff's actual lateness." (Pl. Obj. at 21.) Not so. Judge Bloom made clear throughout the R&R that "[b]ecause attendance problems related to her disability did not alone cause her demotion, it does not prove pretext." (R&R at 28; see also id. at 30-31 (cataloging criticisms of Plaintiff's work performance unrelated to lateness); id. at 33 ("In sum, despite [P]laintiff's good performance in the past and subsequent physical hardships, multiple supervisors' negative reviews of her performance, the numerous complaints relating to issues with her areas of supervision, and her repeated failure to comply with [D]efendants' attendance policy undermine her attempts to paint [D]efendants' legitimate, nondiscriminatory reasons for her demotion as pretextual.").)[15] See also Melrose v. N.Y. State Dep't of Health Office of Prof'l Med. Conduct, No. 07-CV-8778 (JSG), 2011 WL 14311981, at *6 (S.D.N.Y. Mar. 2, 2011) (prima facie case is not established where "poor attendance [due to disability] was not the only reason for [plaintiff's] termination").

ii.    Conversation between Doherty and Plaintiff

According to Plaintiff, Judge Bloom overlooked that at the time Defendants demoted Plaintiff, Doherty asked her whether she ever considered going out on disability. (Pl. Obj. at 24 (citing Pl. Dep. at 330:14-18).) Plaintiff argues that this conversation permits the inference that

---

[15] Even if Judge Bloom had based her entire pretext analysis on Plaintiff's absenteeism, and even if every instance of lateness was due to Plaintiff's disability, "[t]he ADA does not require employers to tolerate chronic absenteeism even when attendance problems are caused by an employee's disability." Lewis v. N.Y.C. Police Dep't, 908 F. Supp. 2d 313, 327 (S.D.N.Y. 2013), aff'd, 537 F. App'x 11 (2d Cir. 2013) (summary order); see also Pierce v. Highland-Falls-Fort Montgomery Cent. Sch. Dist., No. 08-CV-1948 (RKE), 2011 WL 4526520, at *5 (S.D.N.Y. Sept. 28, 2011) ("[Plaintiff's persistent absence from work, alone, precludes him from being considered qualified under the ADA."). Considering all of the reasons for Plaintiff's demotion beyond her chronic lateness (whether pursuant to FMLA leave or otherwise), the court need not conclude so broadly.

Doherty based the demotion not on Plaintiff's performance, but rather, on her underlying disability. (Id. at 25.) However, Doherty stated during his deposition that any comments that he made to Plaintiff concerning her disability during such a conversation were in response to a statement by Plaintiff "that she had been ill and that it had presented some difficulties for her." (Donald Doherty Dep. Tr. ("Doherty Dep.") (Halpern Decl., Ex. D (Dkt. 66-2)) at 143:25-144:2.) Thus, the fact that Plaintiff recalls Doherty mentioning her disability during their conversation does not, as Plaintiff claims, establish that the demotion lacked a legitimate, nondiscriminatory basis.

### iii. Plaintiff's performance review

Plaintiff argues that Judge Bloom ignored "overwhelming irregularities" in Plaintiff's March 2011 performance review (reviewing performance in 2010), and that "[s]ome combination of these numerous irregularities permits the inference that Yussuff concocted the review." (Pl. Obj. at 25-27.) Indeed, Judge Bloom recognized that several reviewers appear to have ratified Yussuff's scores rather than computing their own scores, and that certain reviewers lacked knowledge sufficient to score Plaintiff on certain areas of the review. (R&R at 10 n.7, 29.) But, as Judge Bloom concluded, even if these ratings are omitted, Plaintiff's score only increases by a small increment, and remains in the same unsatisfactory range. (Id.)

Plaintiff also overemphasizes the purported irregularities, and at times misconstrues the record. For example, Plaintiff argues that other HSAs were not reviewed until March 16, 2011, even though Plaintiff's review occurred weeks prior, on February 23, 2011. (Pl. Obj. at 26.) But, as Defendants point out, the evidence shows that the reviewers met on February 23, 2011, to complete individual reviews of all HSAs (not just Plaintiff), and Defendants disclosed the results of reviews on March 16, 2011, for all HSAs. (Defs. Resp. at 22; see also Supp. Decl. of Donald

Doherty ("Supp. Doherty Decl.") (Dkt. 68-2) ¶¶ 33, 35 & Exs. V-DD.) Similarly, although

Plaintiff claims that certain reviewers lacked a basis to review her, the individual review sheets

make clear that several members of the review panel had significant concerns about Plaintiff's

leadership abilities. (See, e.g., Supp. Doherty Decl., Ex. V (individual review sheets for

Plaintiff's performance review) ("Not effective in dealing with the issues in the facility. Lacks

leadership skills."); id. ("Appears to be lacking in leadership skills, poor presentation at

meetings—at times appears unfocused on her duties & expectations."); id. ("Mrs. Forrester has

currently demonstrated a lack of man[agerial] skills that are clearly affecting the clinical

operation of NIC.").)[16]

Plaintiff also argues that another FMLA-utilizing HSA received a poor score on his

performance review. (Pl. Obj. at 25; see also id. at 17-18.) But Plaintiff ignores that (1) the

other HSA's poor score was actually an improvement from his prior year's performance; (2) the

performance of two other FMLA-utilizing HSAs improved from the prior year to the year in

question; and (3) other, non-FMLA-utilizing HSAs saw their scores drop under the new metrics.

(See Defs. Resp. at 23.) Thus, this purported "irregularity" identified by Plaintiff is not

probative of any attempt by Defendants to use the new performance review system to get rid of

FMLA-utilizing HSAs like Plaintiff.

Finally, Plaintiff objects to Judge Bloom's reliance on the fact that Yussuff gave Plaintiff

a positive review in years prior. (See R&R at 29.) See also Grady v. Affiliated Cent., Inc., 130

F.3d 553, 560 (2d Cir. 1997) (at summary judgment, fact that person who fired plaintiff also

hired her "strongly suggest[s] that invidious discrimination was unlikely"). While "the fact that

'evaluations of the plaintiff post-dating the protected activity contradict earlier evaluations' may

---

[16] Quotes are taken from different reviewers' responses to the same question regarding whether Plaintiff was properly placed in her position as HSA of the NIC.

serve as evidence of pretext," Ellis v. Century 21 Dep't Stores, 975 F. Supp. 2d 244, 287

(E.D.N.Y. 2013) (quoting Ibok v. Sec. Indus. Automation Corp., 369 F. App'x 210, 213

(2d Cir. 2010) (summary order)), here, many of the more positive reviews of Plaintiff by

Defendants also post-dated Plaintiff's announcement of her disability and applications for FMLA

leave. (See also Defs. Resp. at 22 & n.36.) Thus, the drop in Plaintiff's performance reviews is

not probative of pretext, particularly in light of the corroboration provided by DOH's repeated

criticisms of Plaintiff's performance in the NIC and of the NIC more generally.

The court has reviewed Plaintiff's remaining objections concerning the performance

review, as well as Defendants' responses, and finds that Plaintiff's additional factual arguments

lack any support in the evidentiary record or lack merit.

> iv.    Procedural irregularities and lack of HR investigation

In the R&R, Judge Bloom explained that Defendants did not violate their own

disciplinary policy of giving a warning prior to demotion, "[g]iven the notices [P]laintiff

received regarding her deficient performance, including counseling regarding how to comply

with PHS's attendance policy." (R&R at 31-32.) Plaintiff objects that "every modern employee

handbook contains a caveat that . . . the employer may deviate from any of the policies contained

therein at any time[,]" and that "the question is whether the evidence indicates an irregularity

from which the finder of fact can infer pretext." (Pl. Obj. at 28.) Regardless of whether

Plaintiff's observation is correct, the evidence shows that Plaintiff was on notice concerning her

lateness and the problems it was causing in the NIC, as well as the criticisms of the NIC; thus,

the fact that Defendants did not give her a "final warning" before the demotion is not evidence of

pretext.

39

Judge Bloom also concluded that Doherty's dismissal of Plaintiff's claim that Yussuff discriminated against her does not suggest an inadequate investigation by Defendants. (R&R at 30-31; see also May 12, 2011, Ltr. from Doherty to Pl. (Doherty Decl., Ex. M (Dkt. 65-8)) ("[B]ased solely on your performance, I had no alternative but to remove you from your position as the HSA at NIC. . . . Your contention that this action was due to your 'disability' is without merit. . . . I can assure you that your request for intermittent FMLA leave over one year ago, which continues today, has no bearing on PHS' decision to remove you from your position as the HSA.").) Here, again, Judge Bloom referenced "the well-documented complaints about [P]laintiff's performance from other PHS staff and PHS's client, DOH," concluding that Doherty's determination that the demotion was due to "poor performance" and not a discriminatory motive was appropriate. (R&R at 31.) Plaintiff objects, but fails to cite any evidence showing that Doherty's investigation was inadequate or any persuasive reason why Judge Bloom's analysis is incorrect.

### v. Targeting of Plaintiff

Plaintiff argues that the fact that she was the only member of the NIC leadership team to receive a demotion is evidence that she was targeted due to her disability and FMLA status. (Pl. Obj. at 28-30.) The R&R concluded that Plaintiff's purported disparate treatment arguments were "unavailing," since Plaintiff failed to "'show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.'" (R&R at 32 (quoting Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000)).) Plaintiff argues that she offered the evidence not to show disparate treatment, but rather, to rebut Defendants' contention that they demoted Plaintiff in response to requests from DOH for a change in leadership at the NIC. (Pl. Obj. at 28.) But, as Judge Bloom concluded, Plaintiff was the only member of the NIC

leadership team with solely administrative duties, and DOH's criticisms of the NIC focused in significant respect on those duties. (R&R at 32.) See also Evans-Gadsen v. Bernstein Litowitz Berger & Grossman, LLP, 491 F. Supp. 2d 386, 397 (S.D.N.Y. 2007) (plaintiff failed to establish pretext at summary judgment where "there [was] nothing in the record to suggest that any of the secretaries who were reassigned had anything approaching Plaintiff's record of difficulty interacting with fellow employees or complaints about work product"), aff'd, 323 F. App'x 59 (2d Cir. 2009) (summary order). In addition, although they were not demoted, the other leaders were in fact transferred out of the NIC to other facilities at Rikers Island. (Id. at 12; Defs. Resp. at 37.)

The court has reviewed Plaintiff's additional objections regarding her purported targeting and similarly finds them to be without merit.[17]

### vi. *Statistical evidence*

The R&R explained that the record failed to show that Defendants treated FMLA-utilizing HSAs differently than non-FMLA-utilizing HSAs. (R&R at 32-33.) Plaintiff objects, arguing that Judge Bloom failed to examine the full record. (Pl. Obj. at 30-32; see also id. at 18 (arguing that Defendants terminated the employment of another FMLA-utilizing HSA in March 2011).) Defendants counter that Plaintiff's "statistical" evidence is meaningless given the small sample size of FMLA-utilizing HSAs, and that in any event, Defendants have established that across a larger sample size (the entire population of employees at Rikers Island), FMLA-utilizing employees were in fact less likely to be fired than other employees. (See Defs. Resp. at 23-25.) As discussed above in the context of performance reviews, the record does not

---

[17] For example, Plaintiff questions whether the timesheets and performance reviews of the other NIC leaders would show that they were equally guilty of chronic lateness. (Pl. Obj. at 38.) But it appears that Plaintiff never requested these materials during discovery, and the lack of such evidence in the record does not nullify Plaintiff's burden to put forward sufficient evidence of pretext to survive summary judgment.

indicate any worse treatment for FMLA-utilizing HSAs such as Plaintiff; therefore, Plaintiff's objection is unavailing.

          b.    *Suspension and Termination*

With respect to the discrimination claims based on Plaintiff's suspension and ultimate termination, Judge Bloom again concluded that Plaintiff failed to offer sufficient evidence to raise an inference of pretext. (R&R at 34-40.) Plaintiff's objections focus on the temporal proximity between her termination and her requests for FMLA leave, as well as Judge Bloom's view of certain facts. (See Pl. Obj. at 33-41.) In sum, the court finds that Plaintiff has failed to offer sufficient evidence to permit the inference "that an illegal discriminatory reason played a motivating role" in the suspension and termination. Bickerstaff, 196 F.3d at 446-47; see also Schnabel, 232 F.3d at 90.

          i.    General sequence of events

Plaintiff argues that Judge Bloom "ignores caselaw that the sequence of events leading to [her] suspension and termination—that she was fired, reinstated, and demoted in the previous months, for reasons entirely different than those articulated for her suspension and termination—can be relied on [to] establish pretext." (Pl. Obj. at 33.) Plaintiff cites no cases in support of this objection, but refers to cases cited in her brief in opposition to summary judgment. (See Pl. Mem. of Law in Opp'n to Defs. Mot. for Summ. J. (Dkt. 67) at 38-39.) Plaintiff overstates the utility of these cases. For example, in Behringer v. Lavelle School for the Blind, No. 08-CV-4899 (JGK), 2010 WL 5158644, at *11 (S.D.N.Y. Dec. 17, 2010), the court explained that allegations that the defendants "engaged in escalating, negative conduct towards [plaintiff] over an eight-month period until an opportunity to fire her presented itself during the February 2007 incident" was enough evidence, "however attenuated . . . to support an inference of

discrimination with respect to temporal proximity, and the plaintiff has established a prima facie case under the ADA." Here, the question is not whether Plaintiff has established a prima facie case, but whether, at the summary judgment stage, she has garnered enough evidence to permit an inference of pretext. Plaintiff has not. The court is cognizant of the fact that Plaintiff's final two years of employment were—for lack of a better term—complicated, and that Defendants may have contributed to Plaintiff's roller-coaster ride by terminating her, re-hiring her on a temporary basis, and then demoting and transferring her, before ultimately suspending and firing her. Defendants' actions, however, do not tend to demonstrate that they acted with discriminatory motives at any point or that the justifications they have proffered are pretext.

ii.     Efforts to arrive at reasonable accommodation

Plaintiff argues that Defendants' efforts to arrive at a reasonable accommodation, which continued until the security breach and her suspension, demonstrate pretext.[18] (Pl. Obj. at 34-35.) Plaintiff cites, for example, a September 12, 2011, email from McNerney to Plaintiff in which McNerney stated that "[i]t would constitute a severe hardship on operations if we could not predict your arrival time within a reasonable degree of certainty." (Id. at 34 (quoting Bernstein Aff., Ex. 66 (Dkt. 67-3)).) In the very same email chain, however, McNerney also stated that she sought to have a conversation with Plaintiff "about how to best accommodate [her] disability." (Bernstein Aff., Ex. 66.) Then, on September 15, 2011, Defendant decided to send Plaintiff to an independent medical evaluation. (See Email from Doherty to McNerney (Bernstein Aff., Ex. 16).)

---

[18] Plaintiff does not bring a direct claim against Defendants for a failure to accommodate, but relies on evidence regarding efforts to reach an accommodation to support her discrimination and retaliation claims. (See R&R at 21 n.12, 25 n.17; see generally Am. Compl.) See also McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 101 (2d Cir. 2009) ("It is even possible, although we need not decide the issue here, that a failure to engage in a sufficient interactive process where accommodation was, in fact, possible constitutes prima facie evidence of discrimination on the basis of disability.").

As Judge Bloom concluded, this is not a case where Defendants failed "to engage in an iterative process to devise a reasonable accommodation." (R&R at 35-36.) See also McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 101 (2d Cir. 2009). Rather, over a period of years, Defendants granted a reasonable accommodation to Plaintiff and attempted to work with her to arrive at a mutually agreeable practice regarding FMLA lateness. (R&R at 35-36.) Cf. Carr v. Reno, 23 F.3d 525, 531 (D.C. Cir. 1994) ("[T]o require an employer to accept an open-ended 'work when able' schedule for a time-sensitive job would stretch 'reasonable accommodation' to absurd proportions.").

Nor does Defendants' decision to seek a medical evaluation demonstrate pretext. "The fact that McNerney was engaging in a statute-authorized process does not support the inference that her subsequent suspension of [P]laintiff, under Doherty's orders, was discriminatory." (R&R at 36.) See also 42 U.S.C. § 12112(d)(4)(B) ("A covered entity may make inquiries into the ability of an employee to perform job-related functions."); 29 C.F.R. Pt. 1360, App. (Interpretive Guidance on Title I of the ADA) ("The provision permits employers or other covered entities to make inquiries or require medical examinations necessary to the reasonable accommodation process described in this part.").

### iii. The breach

Plaintiff lodges several objections targeting the R&R's analysis of the security breach itself and of Defendants' reaction to the breach. First, Plaintiff argues that the R&R overemphasized one of Plaintiff's proffered explanations for the breach—that from time to time, she was away from her desk, and that perhaps someone else sent the emails in question. (Pl. Obj. at 36-37.) But in addition to considering this rationale, Judge Bloom also considered Plaintiff's testimony that she "could not remember sending [the emails]." (R&R at 35.) Judge Bloom did

44

not place any weight on Plaintiff's evidence, since "[P]laintiff's inability to remember sending the emails and the fact that she may have stepped away from her computer to go to the bathroom does not support her self-serving 'speculation and conjecture' that the BING emails were sent from her work email to her home email as a calculated, conspiratorial act to support her termination." (Id. (quoting Woodman v. WWOR-TV, Inc., 411 F.3d 69, 88 (2d Cir. 2005)).) Moreover, even if the breach was an accident, Defendants reported the breach well before they heard Plaintiff's explanation that it must have been an accident; and even if it was an honest accident, it was still reasonable (and perhaps necessary) for Defendants to notify DOH and DOC. (See Defs. Resp. at 11 n.11.)

Second, Plaintiff argues that the R&R ignores "irregularities" in the emails themselves, claiming that it would be impossible to send so many BING attachments in a two-minute period. (Pl. Obj. at 37.) Plaintiff offers no evidentiary support for this bald assertion.

Third, Plaintiff argues that over time, Defendants shifted their concerns about the breach, focusing first on a breach of prison security, then on a HIPAA breach, and finally on the fact that Plaintiff transmitted the documents in unencrypted form. (Pl. Obj. at 37-38.) This assertion finds no support in the record; rather, the evidence demonstrates that Defendants were concerned both with prison security and HIPAA throughout both the initial investigation of the incident and during Plaintiff's eventual termination.

iv.     Defendants' IT policy and security policy

Plaintiff argues that McNerney should have alerted Plaintiff's immediate supervisor and completed an incident report, and that the failure to do so "robs Plaintiff of documentary evidence of the reason for her suspension, establishing pretext." (Pl. Obj. at 33-34.) As Defendants point out, however, McNerney immediately reported the incident to a higher-ranking

45

official, negating the need to inform Plaintiff's direct supervisor. (Defs. Resp. at 12.) In other words, McNerney's "treatment of the breach as more serious than Plaintiff would have it, rather than less, cannot support a finding of pretext." (Id.; see also R&R at 36 ("[G]iven HIPAA and security protocols, it was not unreasonable for McNerney and Corizon to immediately suspend [P]laintiff.").)

                    v.      Timing and documentation of suspension

Plaintiff argues that Defendants' explanation for Plaintiff's suspension is "rendered implausible by the immutable laws of physics." (Pl. Obj. at 35-36 (arguing that it would have been highly unlikely to discover the breach and suspend Plaintiff within a period of roughly one hour).) But Plaintiff cites no evidence beyond mere conjecture, and failed to rebut Defendants' evidence of the timing of the suspension. (See Defs. Statement of Undisputed Material Facts (Dkt. 65-2) ¶¶ 222-28; R&R at 34 ("Plaintiff speculates that McNerney discovered the BING emails and recommended her suspension with such swiftness because PHS was closely monitoring her performance to find an excuse to fire her. Her conjecture is not evidence, nor is it supported by the record.").)

Plaintiff's objection that the R&R "takes no mind of the fact that none of the process or reason [sic] for [Plaintiff's] suspension was documented" (Pl. Obj. at 35), ignores that Judge Bloom considered the argument, but concluded that Plaintiff in fact offered "no affirmative evidence contradicting" the deposition testimony and email evidence offered by Defendants (R&R at 34). Whether circumstantial or direct, "[t]here is no record evidence that McNerney targeted [P]laintiff or continuously monitored her email for the purpose of discovering a terminable offense." (Id. at 35.)

vi.     Defendants' subsequent investigation

Plaintiff contests Judge Bloom's conclusion that "Doherty and McNerney did conduct an investigation into the basis for [P]laintiff's suspension, which included interviewing [P]laintiff and considering her claims of discrimination." (Pl. Obj. at 38 (quoting R&R at 36).) Plaintiff argues that Defendants did not consider Plaintiff's claims of discrimination during their investigation of the security breach. Defendants respond that they immediately commenced an investigation of the breach upon its discovery, and that Plaintiff's complaint to the company's compliance hotline did not allege that her suspension was discriminatory, but rather sought an explanation for why she was suspended. (Defs. Resp. at 17.)

Both parties make colorable arguments. The report summarizing Plaintiff's complaint to the compliance line does not indicate that Plaintiff claimed that the suspension related to her disability. (See Nov. 2, 2011, Mem. from Scotty Lee to McNerney (Supp. Doherty Decl., Ex. JJ).) And while McNerney's notes taken during the post-suspension meeting with Plaintiff indicate that Plaintiff "has made inquiries" regarding FMLA (see McNerney notes (Supp. Doherty Decl., Ex. HH)), it does not appear that the claims of disability discrimination were a significant part of Defendants' investigation (see Oct. 27, 2011, Ltr. from McNerney to Pl. (Halpern Decl., Ex. VV (Dkt. 66-8))), even though Plaintiff did allege in two emails to Defendants that she believed her suspension was the result of discrimination based on her disability and requests for reasonable accommodations (see Sept. 27, 2011, and Oct. 24, 2011, Emails from Pl. to McNerney, Doherty, and Donahue (Bernstein Aff., Exs. 67, 74 (Dkt. 67-3))). Thus, it is not entirely clear from the record whether Defendants' investigation of the security breach included an investigation concerning alleged discrimination against Plaintiff.

However, even if Defendants failed to investigate Plaintiff's claim that her suspension was due to discrimination, it is clear that Defendants did investigate the security breach and determined that Plaintiff should be terminated as a result of its occurrence. Plaintiff does not cite any cases supporting the argument that the lack of an investigation under these circumstances is probative of pretext. In her brief opposing summary judgment, she did point to two cases; neither, however, is on point. In Collins v. Cohen Pontani Lieberman & Pavane, No. 04-CV-8983 (KMW) (MHD), 2008 WL 2971668, at *12 (S.D.N.Y. July 31, 2008), in determining that plaintiff stated a prima facie case of discrimination, the court took into account the fact that defendant failed to investigate adequately plaintiff's prior complaint during a performance review that the failure to promote her was discriminatory. In its pretext analysis, however, the court did not expressly consider the defendant's failure to investigate adequately plaintiff's prior claim of discrimination. Id. at *13. Similarly, in Sassaman v. Gamache, 566 F.3d 307, 314-15 (2d Cir. 2009), the Second Circuit reversed a district court's determination that plaintiff failed to state a prima facie case of discrimination, holding that "[t]he failure of an employer to conduct an adequate investigation or to undertake an appropriate response can constitute evidence in support of a Title VII plaintiff's allegations." But the court also emphasized that "it [did] not hold that an arguably insufficient investigation of a complaint of sexual harassment leading to an adverse employment action against the accused is, standing alone, sufficient to support an inference of discriminatory intent." Id. at 315.

Thus, while the record does not fully support Judge Bloom's conclusion that Defendants investigated Plaintiff's post-suspension claims of discrimination, whether Defendants conducted an adequate investigation post-suspension does not affect the R&R's conclusion that Plaintiff

fails to offer sufficient evidence of pretext with respect to the suspension itself.[19]  Defendants

took seriously Plaintiff's security and HIPAA breach, investigated the cause of the breach, and

addressed Plaintiff's complaint to the compliance hotline that she was suspended without

explanation.[20]  Moreover, DOC independently investigated the security breach and indefinitely

suspended Plaintiff's security clearance.  Finally, there is no indication that Yussuff—the

primary alleged discriminator in this case—was involved in the decision to suspend and

terminate Plaintiff's employment, as he was no longer Plaintiff's supervisor at that time.

### vii.    Automatic termination

Plaintiff argues that "automatic termination" upon the sending of the unencrypted emails

suggests pretext. (Pl. Obj. at 39.)  But Plaintiff was not terminated upon the discovery of the

breach; rather, given the seriousness of the breach, she was suspended, and ultimately terminated

when, after DOC independently determined that she violated the prison's security policy and

HIPAA, it indefinitely suspended her DOC clearance.  Thus, Plaintiff's objection is without

merit.

### viii.    Delay of report to DOH and DOC

Plaintiff argues that the R&R improperly dismissed the fact that Defendants did not

report the breach to DOC until two weeks after her suspension.  (Id. at 36.)  As Judge Bloom

concluded, however, "whether Doherty reported the BING emails to DOC immediately or ten

days later, after [P]laintiff's interview, is not a material factual dispute."  (R&R at 36 (emphasis

added).)  In any event, the uncontroverted evidence shows that Doherty actually informed both

---

[19]  To the extent this Memorandum and Order clarifies the analysis of Plaintiff's evidence, the R&R is so modified.

[20]  Defendants were also aware of Plaintiff's prior allegations of discrimination in connection with her demotion months earlier.  (See May 12, 2011, Ltr. from Doherty to Pl. (Doherty Decl. Ex. M (Dkt. 65-8)) ("[B]ased solely on your performance, I had no alternative but to remove you from your position as the HSA at NIC. . . . Your contention that this action was due to your 'disability' is without merit. . . . I can assure you that your request for intermittent FMLA leave over one year ago, which continues today, has no bearing on PHS' decision to remove you from your position as the HSA.").)

DOH and DOC of the breach within one or two days of it occurring. (See Supp. Doherty Decl. ¶¶ 65-74.)

ix.    Revocation of Plaintiff's security credentials

Plaintiff argues that it was Defendants who ultimately determined that the revocation of Plaintiff's security credentials was permanent, and not DOC; in other words, "Defendants cannot launder their termination of [Plaintiff] through the DOC." (Pl. Obj. at 39-41.) Plaintiff, however, overstates the evidence. DOC imposed an "indefinite suspension," which meant that the clearance could be reinstated, but only "if the employee is cleared of culpability and there is a petition for reconsideration, usually from the employer." (R&R at 37 (citing Eric Berliner Dep. Tr. ("Berliner Dep.") (Halpern Decl., Ex. C (Dkt. 66-2)) at 35:5-36:5, 40:2-5)); see also Defs. Resp. at 14 n.21 (quoting Berliner Dep. at 47:17-23, 48:7-12).) Plaintiff does not dispute that as a result of the breach, her clearance was suspended, and therefore Plaintiff "could not access Rikers Island to perform her job." (R&R at 37.) While Defendants had discretion whether to suspend or terminate Plaintiff's employment in light of the indefinite suspension of her DOC clearance, Defendants chose the latter in light of the gravity of the breach. As Judge Bloom concluded, "[n]othing in the record supports [P]laintiff's position that her termination was discriminatory or retaliatory because her clearance would have been reinstated." (Id.) This includes evidence cited by Plaintiff that the credentials of other employees who were suspended were eventually reinstated. (Pl. Obj. at 40-41.) As Judge Bloom concluded, the general information offered by Plaintiff fails to show that the others were similarly situated to her. (See R&R at 40-41.)

50

x.     Statements by DOC and DOH Executives

Finally, Plaintiff claims that Judge Bloom overlooked deposition testimony from DOC
and DOH representatives that shows that "Defendants were looking for a reason to fire [her]."
(See Pl. Obj. at 2-3.) But the testimony to which Plaintiff points is either inadmissible or not
probative. Eric Berliner, DOC's Associate Commissioner for Health Affairs and Nutritional
Services, stated during his deposition that he did not believe Defendants were "looking for a
reason to fire" Plaintiff (Berliner Dep. at 41:14-18), but acknowledged that "there was a rumor
mill about her coming back when she returned to work" after her first termination (id. at 43:18-
20). The rumor, according to Berliner, was "Bernice got those guys. They had to hire her back.
I am sure they will get her eventually." (Id. at 44:4-6.) Berliner also stated that Yussuff's name
"certainly came up in the rumor mill." (Id. at 44:19-20.) These purported rumors are hearsay;
indeed, Berliner could not even recall the names of the individuals who discussed Plaintiff's first
termination. In any event, Berliner also testified that he did not hear "anything from the rumor
mill about [Plaintiff's] [second] termination subsequent to her [first] termination." (Id. at 45:10-
15 (alterations added to provide context).) Thus, even if admissible, Berliner's testimony about
Plaintiff's initial termination has little probative value with respect to her subsequent suspension
and termination.

Dr. Homer Venters, DOH's Assistant Commissioner for Correctional Health Services,
stated during a deposition that based on the prior termination in 2010, he "suspected" that
Defendants were "looking for an excuse to fire [Plaintiff]" when they suspended her in 2011.
(Venters Dep. at 79:18-80:6.) But Venters also acknowledged that Plaintiff's security breach
was "clearly an error inconsistent with [DOH] policies." (Id. at 80:15-21.) Without additional

information, Venters's "suspicion" that Defendants were looking for a reason to fire Plaintiff is too conclusory to be afforded any weight.

### 3. ADA Retaliation Claim

With respect to Plaintiff's ADA retaliation claim, Judge Bloom concluded that Plaintiff stated a prima facie case, but failed to rebut Defendants' nondiscriminatory reasons for the adverse actions. (See R&R at 38-40.) Plaintiff objects, focusing again on the temporal proximity between her complaints about Yussuff and her demotion. (See Pl. Obj. at 32.) Defendants respond that Plaintiff misconstrues precedent, and argue that summary judgment on the retaliation claim is proper in light of the proffered legitimate business reasons for the adverse actions. (Defs. Resp. at 18.)

Plaintiff ignores clear authority from the Second Circuit that a retaliation claim fails at the summary judgment stage where the plaintiff produces no evidence beyond "temporal proximity." El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir. 2010) (per curiam). Plaintiff's argument that the claim can survive because there is evidence that all non-retaliatory reasons for the discharge were generated by the alleged discriminator (Pl. Obj. at 32) is not persuasive; Defendants have identified plenty of legitimate reasons unrelated to Yussuff, including complaints from DOH, complaints from others at PHS, and the security breach.[21]

### D. Plaintiff's FMLA Claims

Finally, Plaintiff objects to Judge Bloom's analysis of the legal framework with respect to her FMLA claims.

First, Plaintiff argues that an FMLA interference claim may be based on an employer "discouraging an employee from using [FMLA] leave," as opposed to the denial of benefits. (Pl.

---

[21] As discussed above, the mixed-motive analysis is likely unavailable with respect to Plaintiff's ADA retaliation claim. See supra n.12. However, even if that approach applies, Plaintiff has similarly failed to put forward sufficient evidence to satisfy her burden under that standard.

Obj. at 5 (citing 29 C.F.R. § 825.220(b)).) See also Rinaldi v. Quality King Distribs., Inc., 29 F.

Supp. 3d 218, 230 (E.D.N.Y. 2014) (holding that plaintiff failed to raise a genuine issue of

material fact that employer discouraged her from taking FMLA leave). Plaintiff argues that there

is a genuine issue of material fact centering on the events that occurred in Spring 2010, and the

repeated admonishments of Plaintiff for taking leave. (Pl. Obj. at 5.) However, Plaintiff fails to

point to any admissible evidence showing that she was, in fact, discouraged from taking FMLA

leave, nor was her FMLA leave (which she took over a period of several years) ever actually

revoked by Defendants. (See R&R at 41; Defs. Resp. at 26, 40.) Nor has Plaintiff established

that she was prejudiced in any way by Defendants' alleged discouragement. See Ragsdale v.

Wolverine World Wide, Inc., 535 U.S. 81, 89 (2002) (requiring showing of prejudice by plaintiff

in FMLA case). In light of the fact that Defendants granted Plaintiff's FMLA requests, and the

fact that Plaintiff was permitted to take FMLA leave even during the brief period in 2010 when

Defendants investigated her FMLA eligibility, Plaintiff's interference claim based on

"discouragement" cannot survive summary judgment. See also Higgins v. NYP Holdings, Inc.,

836 F. Supp. 2d 182, 193 (S.D.N.Y. 2011) (listing denial of FMLA benefits as an element of the

claim).

Second, Plaintiff argues that with respect to the FMLA retaliation claim, the FMLA does

not utilize the same statutory text as the ADEA, and therefore a "mixed-motive" standard

applies. (Pl. Obj. at 7.) Here, again, Judge Bloom noted that the Second Circuit has not resolved

which causation standard applies to FMLA retaliation claims after Gross. (See R&R at 41

("Plaintiff's [FMLA] retaliation claim is analyzed under an identical standard as ADA retaliation

claims."); id. at 40 n.22 ("The same uncertainty regarding the standard for discrimination claims

under the ADA exists for retaliation claims.").

The court applies the same McDonnell Douglas framework to Plaintiff's FMLA retaliation claim as it did to her ADA discrimination and retaliation claims. See Potenza v. City of N.Y., 365 F.3d 165, 168 (2d Cir. 2004) (per curiam) (applying McDonnell Douglas framework to FMLA retaliation claim). The court notes, as Judge Bloom did, that it is an open question whether a mixed-motive approach is still permissible for an FMLA retaliation claim. See Serby v. N.Y. City Dep't of Educ., 526 F. App'x 132, 135 (2d Cir. 2013) (summary order) ("Because [plaintiff's] claim fails under either the McDonnell Douglas burden-shifting framework or the mixed-motive analysis, we need not decide which applies to an FMLA retaliation claim."). In any event, as discussed above in connection with the ADA discrimination claim, the court ultimately must decide, under either standard, whether Plaintiff presented "sufficient admissible evidence from which a rational finder of fact could infer that more likely than not she was the victim of intentional discrimination." Bickerstaff, 196 F.3d at 447. With respect to the FMLA retaliation claim, the inquiry is thus whether the Defendants' proffered reasons for the employment actions are merely pretext for retaliation.

As with her ADA claims, the court finds that Plaintiff has failed to put forward sufficient evidence in the third step of the McDonnell Douglas analysis. See, e.g., Serby v. N.Y. City Dep't of Educ., No. 09-CV-2727 (RRM) (VVP), 2012 WL 928194, at *10 (E.D.N.Y. Mar. 19. 2012) ("Simply put, the uncontroverted record reflects that plaintiff struggled with classroom management in her first year before her FMLA leave, and that those struggles by-and-large continued during her second year. . . . Plaintiff cannot use the FMLA to immunize herself from the [defendant's] legitimate evaluation system."), aff'd, 526 F. App'x 132. And, even if the mixed-motive approach is available, as discussed above in connection with the ADA claims, considering that Plaintiff utilized FMLA intermittent leave for a period of years, Plaintiff has

failed to put forward sufficient evidence of a "smoking gun" or "thick cloud of smoke" regarding Defendants' alleged retaliation against her for such use. See id. at *7 n.8.

## VI.    CONCLUSION

Accordingly, for the reasons set forth above, the court ADOPTS IN PART and MODIFIES IN PART the R&R, and GRANTS summary judgment to Defendants on all claims under the ADA, FMLA, and ADEA. The court declines to exercise supplemental jurisdiction over Plaintiff's NYCHRL claims, and accordingly, DISMISSES the NYCHRL claims without prejudice to re-file in state court. The Clerk of Court is respectfully DIRECTED to enter judgment for Defendants and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
      March 30, 2015

NICHOLAS G. GARAUFIS
United States District Judge